IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| LONNIE KADE WELSH, | § | |
| Institutional ID No. 6516607, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:22-CV-183-BQ |
| | § | |
| BRIAN WILLIAMS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, civilly committed sexually violent predator (SVP) Lonnie Kade Welsh filed this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights as well as rights under Texas state law.  Welsh seeks monetary damages for his alleged injuries.  Compl. 38–49, ECF No. 1.[1]

On July 18, 2022, the United States District Judge transferred this case to the undersigned United States Magistrate Judge to conduct preliminary screening.  ECF No. 7.  The undersigned thereafter reviewed Welsh's Complaint, as well as authenticated records provided by the Texas Civil Commitment Center (TCCC) and the Texas Civil Commitment Office (TCCO), and ordered Welsh to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976).  ECF No. 14.  Welsh timely completed and returned the questionnaire.  ECF Nos. 16, 17. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

---

[1] Page citations to Welsh's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

# I.    Standard of Review

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.[2]    28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002) (per curiam) (affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)).  A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories.  *See id.* at 327.  When analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records.  *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' in forma pauperis claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim.  *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam).  And

---

[2] At the time of filing, Welsh was not a "prisoner" within the meaning of 28 U.S.C. § 1915(h), and his claims are not, therefore, subject to the screening provisions of the Prison Litigation Reform Act.  Because Welsh sought and was granted leave to proceed IFP, however, he is nevertheless subject to the screening provisions of 28 U.S.C. § 1915(e)(2).

while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id*. (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.    <u>Background</u>[3]

Welsh was involved in a use of force incident at the TCCC on September 15, 2020. Compl. 8, 29–38. Based on his alleged assault against a security guard during the incident, the State charged Welsh under TEX. PENAL CODE § 22.01(b)(4). *Id.* at 13. Welsh appeared before a magistrate who found that there was probable cause for the arrest. *Id.*; Questionnaire 9. Thereafter, Welsh "was charged by warrant" under TEX. PENAL CODE § 22.01(b-1)(2)(B) (Compl. 13; Questionnaire 9), and the magistrate also found probable cause for the amended charge. Questionnaire 9. A grand jury then indicted Welsh for violating § 22.01(b-1)(2)(B). *Id.* Welsh was confined in the Lamb County Jail for approximately eighteen months until the State dropped the charges "in the interest of justice." Compl. 23, 28–29, 37.

---

[3] Welsh's pleadings span over 100 pages without exhibits. Compl. 1–40; Questionnaire 1–70, ECF No. 17. In construing Welsh's legal claims, the Court primarily relies on the Complaint because it is organized into sections in which Welsh identifies each cause of action and the parties sued in connection therewith. Compl. 29–38. As to the factual bases for those claims, Welsh's alleged "facts" are often unsupported assertions and/or legal conclusions and are therefore improper. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) ("The court does not . . . 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" (citation omitted)); *LeBlanc v. City of Haltom City*, No. 4:10–CV–812–A, 2011 WL 2149908, at *3 (N.D. Tex. May 31, 2011) (recognizing that "conclusory allegations" are "of no legal effect" because "a complaint [must] plead facts instead of conclusions" and "the facts pleaded must allow the court to infer that the plaintiff's right to relief is plausible"). Further, Welsh's responses to the Court's questionnaire are often repetitive, disorganized, and non-responsive. Welsh frequently "incorporates by reference" prior answers and/or includes information that is not germane to the question. The Court therefore frames Welsh's legal claims as raised in his Complaint and accepts only well-pleaded factual allegations, whether contained in the Complaint or questionnaire.

Finally, Welsh frequently relies on (and directs the Court's attention to) video footage captured by TCCC personnel and law enforcement. *See, e.g.*, Compl. 10–13, 15; Questionnaire 10–13, 15, 19, 23. Lamb County provided authenticated copies of the footage. *See* ECF No. 12. In re-constructing the events, the Court accepts Welsh's well-pleaded factual allegations *except* where clearly contradicted by video. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the district court did not have to accept the plaintiff's description of his driving where it was "blatantly contradicted by" video from the police car's dash cam).

Welsh now brings claims under state and federal law alleging "instances of confinement without legal process and pursuant to legal process, similarly bad-faith, malicious, and vindictive prosecution of Welsh in criminal cause DCR-6076-20." *Id.* at 3.  In short, Welsh believes "[t]he charge should at the most [have] been under Texas Penal Code 22.01(a-1) a Class A Misdemeanor." *Id.* at 21.  He also brings claims "for failure to protect, by standard liability and failure to enforce and selectively withholding the protection of the State's criminal laws equally towards Welsh as a class of one [sic all]." *Id.* at 3.

### A.  Factual Allegations

Welsh names the following Defendants:  (1) Littlefield Police Department (LPD) Officer Brian Williams in his individual capacity; (2) LPD Officer John Doe in his individual capacity; (3) Lamb County Sheriff Gary Maddox in his individual and official capacities; (4) Lamb County District Attorney (DA) Scott Say in his individual and official capacities; (5) Assistant District Attorney (ADA) Rickie Redman in her individual and official capacities; (6) TCCC Facility Administrator Wayne Schmoker in his individual capacity; (5) Management and Training Corporation (MTC)[4] security guard Julian Chavez in his individual capacity; (8) the City of Littlefield, Texas (the City), with LPD Chief Ross Hester as official policymaker; (9) Lamb County, Texas (the County), with Sheriff Gary Maddox, DA Say, and ADA Redman as official policymakers; and (10) MTC with Schmoker as its "principle agent." *Id.* at 1–5.

According to Welsh, he temporarily covered his window to use the bathroom on September 15, 2020. *Id.* at 8.  TCCC Captain Rodriguez asked Welsh to take down the covering, and Welsh responded that he would do so when he was finished using the restroom.  Questionnaire 2.  Authenticated video footage shows that Captain Rodriguez ordered Welsh to remove the covering

---

[4] According to Welsh's Complaint, MTC contracts with the TCCO to provide security at the TCCC.  Compl. 5.

at least three times over the span of nearly two minutes.  Video 1 00:24–02:21.[5]  After Welsh's repeated refusal, Captain Rodriguez decided to call a security team "due to a non-compliant resident" and radioed for "all A-team responders."  Video 1 02:22–:48.

Welsh explains that security staff later arrived at his room and ordered him to submit to handcuffs, but Welsh had removed the window covering.  Questionnaire 2; Compl. 9.  Welsh concedes that he repeatedly refused to submit to hand restraints and instead "asked them to leave [him] alone."  Compl. 9; Questionnaire 2.  After the third formal order, security staff "opened the food port and sprayed" a chemical agent.  Compl. 9; Questionnaire 2.  Welsh stood on a box and blocked the gas with a sheet.  Questionnaire 2.  The video shows security staff directed Welsh to put his hands outside the tray slot several times to no avail.  Video 2 03:05–06:46.  After approximately four minutes, many unsuccessful attempts at gaining compliance, and several warnings, a security staff member instructed a five-man team to enter Welsh's room.  Video 2 06:46–:50.  According to Welsh, he then "threw a bunch of papers on the floor" "in attempt to slow down the" security staff.  Compl. 9; Questionnaire 2.

Welsh claims that, with Defendant Chavez in the lead, TCCC security staff entered the room with protective gear and used a shield to "hit" him "several times" "and push [him] back." Questionnaire 2; Compl. 9.  He claims his "hands where [sic] raised in a motion to surrender" "with his palms open facing" the staff members.  Compl. 9.  Chavez then slipped on the papers Welsh had scattered across the floor.  *Id.*; Questionnaire 2.  While on his knees and/or while falling, Chavez held on to Welsh's shirt and hit him twice in the genital region and once in the stomach. Compl. 9; Questionnaire 2.  Chavez was still wearing a helmet, which purportedly prevented

---

[5] Videos 1–5 are contained on "Disc #1" of the authenticated records provided by the DA's Office, and videos 6–9 appear on "Disc #2."

Welsh from ascertaining the identity of the officer who allegedly struck him.  Compl. 9–10; Questionnaire 2–3.  Welsh removed Chavez's helmet "to reveal the identity of the person who assaulted him."  Compl. 10.  Security staff then took the helmet from Welsh, "place[d] him on the ground," and secured hand and leg restraints.  *Id.*

Video footage of the interaction is less than clear due to the number of bodies, camera angle, and short duration.  Security officer Scott opens the door and Welsh is seen standing near the doorway wearing sunglasses and a mask.  Video 2 07:05.  The five-man team enters in a line, each with their hands on the shoulders of the man in front of them.  The front man makes contact with Welsh[6] at 7:07 and apparently pushes Welsh backwards toward the wall while one or more guards appear to slip on the papers and/or trip over the box near the room's entrance.  The shield is lost in the struggle almost immediately and remains near the entrance for the rest of the interaction.  Between 7:09–:18, the five men break line, surround Welsh, and struggle to get him under control while he continues yelling and fighting against them.  One member of the five-man team is on his knees for most of this period, but not much else is clear because the bodies of the other men block the camera's view of Welsh and the kneeling guard's head.  They take Welsh to the ground, hold him there for a few seconds, and then begin placing the restraints.  Video 2 07:19–:55.  The kneeling guard's helmet is in the background near where Welsh had been standing, and there is a line of blood down the left side of the guard's face.  Video 2 07:19, 07:54–:59.

Security staff then transported Welsh to a new room, offered him medical attention (which he declined), and removed the leg restraints as Welsh kneeled on the floor.  Video 2 11:00–16:43. Welsh refused to relinquish the hand restraints.  Video 3 00:02–3:43.  According to Welsh, staff

---

[6] Welsh claims the team "bashed" him with the shield while his "hands were raised in surrender and [he] verbally surrendered to Chavez."  Questionnaire 10.  At most, Welsh's hands appear to block the blow and/or push away the shield while he yells, "Why are you trying to hurt me?"  *See* Video 2 07:07–:12.

asked him to bend forward while kneeling to remove the cuffs, but he was injured during the use of force and "could not make the bend." Compl. 10. Staff repeated the order for Welsh to submit to a cuff release "in a fashion that was impossible due to his injuries." *Id.* Welsh contends he "attempted to compromise" by telling staff "he would lay flat on his stomach so [staff] could get the cuffs without incident." *Id.* The video shows Welsh hiding under the bed in his room while he inaudibly communicates with staff. Video 4 01:17–03:06. According to Welsh, Defendant "Schmoker then ordered [Security Guard Scott] to spray chemical agents against" him. Compl. 11. Scott did so, and then continued to talk with Welsh through the door for more than three minutes to no avail. Video 4 03:06–6:39. Scott sprayed the chemical agent through the food port a second time. Video 4 06:39–:43. Welsh eventually surrendered the restraints by placing his hands through the food port. Video 4 08:07–:50.

LPD Officers Williams and Doe responded to the scene. Compl. 11. Welsh states that Williams's body-worn camera captured the remaining events giving rise to his allegations. *Id.* Chavez told the officers he "had [Welsh] on the wall" while Welsh held "onto [his] helmet and [his] vest." BWC 1 2:16–:32.[7] Chavez tried to push "his arms away," and Welsh "ripped off [his] helmet and [his] mask and then scratched" him. BWC 1 2:33–:43. Schmoker told the officers that they "just gassed him two more times" because he "jacked [their] cuffs, [they] let him have those cuffs for about two and half hours," but Schmoker grew "tired of letting him have the cuffs." BWC 1 4:16–:35. Welsh alleges Schmoker also told Officers Williams and Doe that he spoke with DA Say and ADA Redman about Welsh. Compl. 11.

Officers Williams and Doe spoke with Welsh and told him he would be charged with assault on a security guard. BWC 1 16:34–17:35. Welsh shared his version of the incident and

---

[7] "BWC" stands for body-worn camera. All four videos are stored on "Disc #3" provided by the DA's Office.

uses of force, including that he protested the charge because he insisted he "didn't hit nobody, [he] didn't attack him" and only "took off his helmet cause he was hitting [Welsh] and he wanted to see his face." BWC 1 17:59–18:08; *see* Compl. 11. The officers then placed Welsh in handcuffs and allowed him to exit his room to complete a written statement. Compl. 11. Williams also photographed Welsh's knee, which Welsh describes as "red and swollen two to three times its normal width." *Id.* at 12. Welsh reports that he then "was instructed to" return to his room, which was contaminated with the chemical agent—because he was not "allowed to wash the gas off or change his contaminated clothing," he refused to comply. *Id.* "Schmoker informed Welsh that he would turn" on the water "but would allow Welsh nothing else to" remove the chemical spray from the room. *Id.* While Schmoker talked with Welsh, Officer Williams commented to Officer "Doe that Welsh was guilty of the assault because Welsh had stated he took off Chavez['s] helmet during the use of force." *Id.*

Welsh maintained his objection to the return order, "ran to the recreation yard, took the cuffs and wrapped them in a chain attached to a fence that could not be removed." *Id.* He maintained he "would only move if he had cleaning supplies." *Id.* Welsh repeatedly yelled at security staff, insisting that he would not comply with orders to return to his room and resisting any attempts to negotiate. Video 6 03:14–9:40. After about fifteen minutes, security staff called a team "to remove Welsh from the fence." Compl. 12; *see* Video 9 00:41–15:02. The team surrounded Welsh and attempted to gain compliance while he repeatedly refused orders to remove himself from the fence, get on the ground, and return to his room. Video 6 09:41–14:33. At one point, a guard "started to count to three threatening [Welsh] with the [chemical] spray if [he] did not submit." Questionnaire 6. When Welsh again refused, a guard on Welsh's right removed

Welsh's sunglasses and another on his left then sprayed him for approximately three seconds.[8]
Video 6 12:31–:38.  Welsh turned his head away during the burst, and then yelled, "Is that all you
got?  Sh** man that ain't nothing!  Sh**!  Hit me again!  That's all you got?  Hit it all!"[9]  Video
6 12:34–:55.  Welsh continued to refuse orders.  Video 6 12:56–14:33.  Eventually, several staff
members struggled to extract Welsh from the fence while he resisted their efforts.  Video 6 14:34–
21:19.  Once untethered, security carried Welsh back to his room and told him to de-contaminate.
Video 6 22:37–23:59, 24:38–29:28.  Welsh insisted he did not want to shower, but he eventually
relented.  Video 6 24:38–29:28; BWC 1 1:27:08–29:45; BWC 2 00:26–1:18.  Officers Williams
and Doe "then took Welsh into custody" on an assault charge.  Compl. 13.

### B.  Statutory and Contractual Provisions

Most, if not all, of Welsh's claims rely on legal arguments concerning Texas statutes and
the contract between TCCO and MTC.  *See id.* at 5–8, 29–38.  The Court first reviews the relevant
language to provide context for Welsh's arguments.

### 1.  The Contract

Welsh provides what appears to be a copy of the contract between TCCO and MTC.  *Id.* at
42–104.  The provision relating to use of force appears within the "SVP Client Rights" section.
*Id.* at 85–86.  It reads as follows:

> Contractor shall ensure that there are written policies, procedures, and practices that
> restrict the use of physical force to instances of self-protection, protection of SVP
> Clients or others or prevention of property damage. In no event shall the use of
> physical force against a SVP Client be justifiable as punishment. A written report
> will be prepared following all uses of force, and promptly submitted to TCCO for
> review. The application of restraining devices, aerosol sprays, chemical agents, and
> related security equipment shall only be accomplished by an individual who is

---

[8] Welsh explains that the chemical spray was "the personal" kind, as opposed to "the riot spray [the guard] used the other three times."  Questionnaire 6.

[9] Welsh alleges he "talked big to not provide satisfaction to them to know they hurt [him]," but he "was in pain."  Questionnaire 6.

properly trained in the use of such devices and only in an emergency situation for
self-protection, protection of others or other circumstances as previously described.

*Id.* at 86.

### 2. *Health and Safety Code Provision*

Section 841.0838 governs the authorized use of mechanical and chemical restraints against

SVPs at the TCCC. It provides:

> (a) An employee of the office, or a person who contracts with the office or an
> employee of that person, may use mechanical or chemical restraints on a committed
> person residing in a civil commitment center or while transporting a committed
> person who resides at the center only if:
>> (1) the employee or person completes a training program approved by the office
>> on the use of restraints that:
>>> (A) includes instruction on the office's approved restraint techniques and
>>> devices and the office's verbal de-escalation policies, procedures, and
>>> practices; and
>>> (B) requires the employee or person to demonstrate competency in the use
>>> of the restraint techniques and devices; and
>> (2) the restraint is:
>>> (A) used as a last resort;
>>> (B) necessary to stop or prevent:
>>>> (i) imminent physical injury to the committed person or another;
>>>> (ii) threatening behavior by the committed person while the person
>>>> is using or exhibiting a weapon;
>>>> (iii) a disturbance by a group of committed persons; or
>>>> (iv) an abscondsion from the center; and
>>> (C) the least restrictive restraint necessary, used for the minimum duration
>>> necessary, to prevent the injury, property damage, or abscondsion.
> (b) The office shall develop procedures governing the use of mechanical or
> chemical restraints on committed persons.

TEX. HEALTH & SAFETY CODE § 841.0838.

### 3. *Texas Penal Code*

The State charged Welsh with felony assault based on his conduct during the use of force

incident. Compl. 13. The relevant statute reads as follows:

> (a) A person commits an offense if the person:
>> (1) intentionally, knowingly, or recklessly causes bodily injury to another,
>> including the person's spouse;

(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

(b) An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

(4) a person the actor knows is a security officer while the officer is performing a duty as a security officer;

(b-1)   Notwithstanding Subsection (b), an offense under Subsection (a)(1) is a felony of the third degree if the offense is committed:

(1)  while the actor is committed to a civil commitment facility; and

(2)  against:

(A)  an officer or employee of the Texas Civil Commitment Office:

(i)  while the officer or employee is lawfully discharging an official duty at a civil commitment facility; or

(ii)  in retaliation for or on account of an exercise of official power or performance of an official duty by the officer or employee; or

(B)  a person who contracts with the state to perform a service in a civil commitment facility or an employee of that person:

(i)  while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by the state to provide the service; or

(ii)  in retaliation for or on account of the person's or employee's performance of a service within the scope of the contract.

TEX. PENAL CODE § 22.01.

### C.  Welsh's Claims

*1.  Fourteenth Amendment Bystander Liability*

Officers Williams and Doe were present during the incident in the recreation yard. Questionnaire 6.  Welsh believes they should have prevented the final use of a chemical agent against him.  Compl. 29.  He alleges Williams and Doe "knew or should have known that" TCCC security staff used "force outside the statutory or contractual grant of power," and that they "knew or should have known" the force was therefore "an assault under state law."  Questionnaire 7. Similarly, he avers that Williams and Doe "knew or should have known that even law enforcement could not use intermediate force such as the [chemical] spray on a passively resisting individual without first using ascending force to gain" compliance.  *Id.* at 8.  Welsh maintains that, as law

enforcement officers, Williams and Doe "could have enforced a verbal order to stop" or could have "take[n] [Welsh] into their custody" to prevent security staff "from attacking" Welsh. *Id.*

### 2. *Fourth Amendment Arrest without Probable Cause and Fourteenth Amendment False Charges*

According to Welsh, Officer Williams violated his Fourth and Fourteenth Amendment rights in connection with the criminal investigation in cause no. DCR-6076-20. Compl. 29–32. That is, Welsh believes Officer Williams tainted the magistrate's and grand jury's probable cause determinations because he intentionally or recklessly misstated the facts and/or omitted "exonerating" or "mitigating evidence." *See id.* at 13–15, 29–32; Questionnaire 9–19, 26–30.

Welsh also collectively holds responsible DA Say, ADA Redman, Officer Williams, Chief Hester, Officer Doe, and Administrator Schmoker for the alleged false charge in violation of the Fourteenth Amendment. Compl. 31–32. He asserts that they "intend[ed] to injure [him] in his liberty during the investigative phase of the criminal charges before the police was [sic] called" because Williams, Schmoker, Say, and Redman discussed "how to proceed with the false charges" and Williams, Redman, Say, and Hester discussed "how to over charge" him "to cover-up the criminal assault." *Id.* at 32. In Welsh's view, this conduct was pursuant to a City and County "custom as applied to Welsh." *Id.*

### 3. *Fourth Amendment Unlawful Seizure and State Law Malicious Prosecution*

Welsh brings Fourth Amendment and malicious prosecution claims against Defendants Chavez and Schmoker for their involvement in his arrest. *Id.* at 30–31. Welsh advances the same arguments in support of each claim—he contends that they violated his rights by (1) "claiming he assaulted Chavez while he acted . . . under the scope of the contract" and (2) "alleging he scratched Chavez, though he stated it was an accidental or involuntary act by Welsh and [Chavez] made-up an elaborate story about pinning Welsh against the wall then putting down the shield as Welsh

removed his gasmask and helmet to scratch[ ] at his face." *Id.* at 30.  Welsh avers that Defendants

"knew these statements would get [him] criminally prosecuted when they lied." Questionnaire 23,

24.  According to Welsh, MTC is likewise "responsible . . . under the doctrine of respondent [sic]

superior [for the] malicious prosecution" because MTC "had the right to control Schmoker and

Chavez." Compl. 28, 31.

> ### 4. Fourteenth Amendment Failure to Protect, Equal Protection, Selective Enforcement

Welsh brings several claims based on the theory that MTC security staff should have been

prosecuted for alleged assaults against him.  Welsh contends that Officer Williams, Officer Doe,

Sheriff Maddox, the City, and the County violated the Fourteenth Amendment because they failed

to protect him "as a member of the civilly committed class" by not criminally charging MTC

personnel with assault.  *Id.* at 32.  Similarly, Welsh posits that Officer Williams, Officer Doe,

Sheriff Maddox, DA Say, ADA Redman, the City, and the County violated his "right to equal

protection of the state criminal protective services" and selectively enforced Texas Penal Code

22.01 against him "either because Welsh is a class of one" or because he "is a member of the

Sexually Violent Predator Class." *Id.* at 33–34.

> ### 5. Conspiracy

Welsh raises conspiracy claims under the Fourteenth Amendment, 42 U.S.C. § 1985(2)–

(3), and § 1986.  *Id.* at 34–35.  According to Welsh, the City, the County, Maddox, Say, Redman,

Hester, Williams, Doe, Schmoker, and MTC conspired to deny him "the equal protection of the

State of Texas Criminal Laws and the criminal statute Texas Penal Code 22.01 and the protection

of Texas Health and Safety Code 841.0838." *Id.*  He further asserts that Defendants conspired "to

impede, hinder, obstruct, or defeat, the due course of justice, with intent to deny to Welsh the equal

protection of the laws or to deprive, Welsh either directly or indirectly, the equal protection of the

laws, or of equal privileges and immunities under the laws [sic all]." *Id.* at 35. Welsh bases these allegations on the conversation between Schmoker, Williams, "and Doe recorded by Williams BWC that [Schmoker] spoke to Say and Redman before he called them about the situation on September 15, 2020." Questionnaire 59. He also claims that Redman "admitted to [him] at a pretrial hearing that she and Say had a phone conference with Schmoker before he called the police." *Id.*

### 6. Fourteenth Amendment Failure to Train and State Law Negligent Hiring, Supervision, and Training

Welsh claims that the City and the County violated the Fourteenth Amendment by failing to train LPD officers and county prosecutors "on how to deal with the rights of the sexually violent predator class in the area of Texas Health and Safety Code 841.0838 and the need for training not to over charge Welsh to cover up the assaults" against him. Compl. 34. "The training program not to cover up crimes," he continues, "is either non existent or not enforced properly." *Id.*

Under Texas state law, Welsh believes MTC "was negligent in its hiring, training and supervision of Schmoker and Chavez and owed a legal duty to Welsh to ensure ordinary care that its employees knew they were not operating under the contract and should not initiate criminal prosecution." *Id.* at 36. He alleges that his injuries were foreseeable because "Schmoker and Chavez are former Texas Department of Criminal Justice prison guards who are use[d] to dealing with convicted criminals with less rights and who can be punished." *Id.*

### 7. Fourteenth Amendment Retaliation and Harassment

Welsh brings a claim against Administrator Schmoker under the Fourteenth Amendment for "retaliation or harassment." *Id.* at 37. He believes Schmoker retaliated by using "his power to refuse Welsh advancement in his therapy" when Welsh returned to the TCCC. *Id.* Welsh explains that he "had previously completed the entire tier one treatment" but that "Schmoker instructed"

the therapists that Welsh "must be punished for the incident" with Chavez. Questionnaire 67. Welsh believes Schmoker did so because he defended himself "against the criminal charge in cause no FCR-6076-20 . . . and because [he] refused to accept a plea offer." *Id.*

### 8. *State Law Intentional Infliction of Emotional Distress and Invasion of Privacy*

Welsh brings state law tort claims against Schmoker and Chavez based on the alleged assault against Welsh on September 15, 2020. Compl. 36; Questionnaire 66. He alleges that they "intentionally or recklessly cause[d] severe emotional distress by extreme or outrageous conduct" and "intrude[d] upon Welsh by physical invasion of his personal residents [sic]." Compl. 36. Welsh further contends that MTC is responsible "under the doctrine of respondent [sic] superior." *Id.*

### 9. *State Law Negligence Per Se*

According to Welsh, Defendants Schmoker and Chavez were negligent per se under Texas state law. *Id.* at 37. Welsh contends they "were negligent under Texas Penal Code 22.01 by assaulting and ordering the assault" and negligent under Texas Health and Safety Code § 841.0838 "because the defendants thought they were authorized by law" to use "mechanical and chemical restraint[s]" on September 15, 2020. *Id.*; Questionnaire 68. Further, Welsh asserts that Defendant "Schmoker was negligent under Texas Health and Safety Code 841.0831 [by] failing to provide seamless transition from totally confinement to release." Compl. 37. Welsh names MTC as additionally responsible under respondeat superior. *Id.*

### 10. *State Law Breach of Contract*

Welsh avers that he "is a third party beneficiary to the contract between [TCCO] and [MTC], whom [sic] are liable to Welsh for breach of contract." *Id.* at 38. He states that the contract provides force may only be used if it "is in the need of self-defense, protection of others or property and force will not be used for disciplinary purposes." *Id.* In his view, MTC breached the contract

because security staff used force against him "outside the need for self-defense and to punish Welsh for the violation of facility rules for covering his window."  *Id.*

### III.    Discussion

**A.  DA Say and ADA Redman are immune from suit in their individual capacities.**

Welsh seeks only monetary damages against Defendants Say and Redman.  Compl. 38–39. As prosecutors, however, Say and Redman are absolutely immune from suit in their individual capacities because Welsh's claims against them concern their decision to prosecute Welsh as well as their decision not to prosecute his alleged assaulters.  *See id.* at 32–35.

Prosecutorial immunity applies to the prosecutor's actions "in initiating a prosecution and in presenting the State's case," *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), and extends to those "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (quoting *Imbler*, 424 U.S. at 431 n.33); *see Wearry v. Foster*, 33 F.4th 260, 266 (5th Cir. 2022) ("[A] contemporary prosecutor's charging decision is protected by absolute immunity by virtue of being the functional equivalent of the activity protected at common law."), *cert. denied*, 2023 WL 3440595 (May 15, 2023); *Shipman v. Sowell*, 766 F. App'x 20, 26 (5th Cir. 2019) ("[P]rosecutors enjoy absolute immunity from § 1983 suits based on all actions taken within the scope of their prosecutorial duties."); *Quinn v. Roach*, 326 F. App'x 280, 292 (5th Cir. 2009) ("The decision to file or not file criminal charges is protected by prosecutorial immunity.").  "Absolute immunity shelters prosecutors even when they act 'maliciously, wantonly or negligently.'"  *Rykers v. Alford*, 832 F.2d 895, 897 (5th Cir. 1987) (citation omitted).  Accordingly, Defendants Say and Redman are absolutely immune from suit and any claims against them for monetary damages should be dismissed for this reason alone.

**B. Welsh has not raised a viable bystander liability claim based on the alleged use of excessive force.**[10]

Welsh believes Officers Williams and Doe should have intervened to protect him against "excessive force and force outside the law of the State of Texas" once they arrived at the TCCC to investigate Welsh's alleged assault against an MTC security guard on September 15, 2020. Compl. 29. That is, Welsh contends Williams and Doe should have prevented the use of chemical spray when Welsh had wrapped handcuffs to a chain fence and refused to comply with orders to release the cuffs or return to his room. Questionnaire 6–7. He claims Williams and Doe "knew or should have known that" TCCC security staff used "force outside the statutory or contractual grant of power," and that they "knew or should have known" the force was therefore "an assault under state law." *Id.* Similarly, he avers that Williams and Doe "knew or should have known that even law enforcement could not use intermediate force such as" chemical spray "on a passively resisting individual without first using ascending force to gain" compliance. *Id.* at 8.

An official's failure to intervene in another's use of excessive force may violate the Constitution and subject the official to § 1983 liability. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). To prevail on a bystander liability claim, a plaintiff must establish that an officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citation omitted). "In resolving whether a plaintiff has sufficiently alleged a bystander-liability claim, the court also considers whether an officer has acquiesced in the alleged constitutional violation." *Brooks v. Taylor Cnty.*, No. 1:20-CV-049-H, 2020 WL

---

[10] Welsh titles this claim, "Standby Liability for Excessive Force and Failure to Protect." Compl. 29. The undersigned construes it as one for bystander liability. To the extent Welsh intended to separately raise an alternative theory of failure to protect, it would fail for the same reasons addressed herein. *See Edmiston v. Culberson Cnty.*, 580 F. Supp. 3d 411, 432 (W.D. Tex. 2022) (recognizing that "[t]he two claims require substantially the same showing").

6163137, at *5 (N.D. Tex. Oct. 21, 2020) (citing *Whitley*, 726 F.3d at 646). Indeed, "[m]ere presence at the scene of the alleged use of excessive force, without more, does not give rise to bystander liability." *Vasquez v. Chacon*, No. 3:08–CV–2046–M (BH), 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009), *aff'd*, 390 F. App'x 305 (5th Cir. 2010). The primary focus is on whether the bystander "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

Welsh did not bring a claim for excessive force against the persons he holds directly responsible. *See* Compl. 29–38. Nevertheless, the Court's analysis requires consideration of whether MTC personnel used excessive force. *See Simpson v. Flores*, No. SA–09–CV–0125 OG (NN), 2011 WL 675041, at *1 (W.D. Tex. Feb. 15, 2011) (observing that courts must first determine whether an unconstitutional use of force took place before determining whether an officer failed to protect the plaintiff).

The Fifth Circuit has not considered the appropriate constitutional standard applicable to a § 1983 excessive force claim brought by a civilly committed SVP. *See Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 317 (5th Cir.), *cert. denied*, 142 S. Ct. 438 (2021). In *Andrews v. Neer*, however, the Eighth Circuit examined the issue, and concluded that an involuntarily committed person's "excessive-force claim should be evaluated under the objective reasonableness standard usually applied to excessive-force claims brought by pretrial detainees." 253 F.3d 1052, 1061 (8th Cir. 2001). In so concluding, the court explained the following:

> The Eighth Amendment excessive-force standard [(typically used to analyze convicted prisoner excessive force claims)] provides too little protection to a person whom the state is not allowed to punish. On the other hand, the state of Missouri was entitled to hold [plaintiff] in custody. His confinement in a state institution raised concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations.

*Id.* The undersigned finds the Eighth Circuit's reasoning instructive and will likewise apply an objective reasonableness standard—the same standard applicable to pretrial detainees.

The United States Supreme Court has recognized that a pretrial detainee's use of force claim arises under the Fourteenth Amendment, and "that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (abrogating lower courts' application of Eighth Amendment excessive force standards in *Hudson v. McMillian*, 503 U.S. 1 (1992) to pretrial detainees). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The reasonableness of the force used must be assessed "from the perspective and with the knowledge of the defendant officer" and with "deference to policies and practices needed to maintain order and institutional security." *Id.* at 399–400. In determining the objective reasonableness of an officer's use of force, a court should consider the following non-exclusive factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 397.

Initially, the Court finds the second *Kingsley* factor (i.e., the extent of plaintiff's injury), accepting Welsh's allegations of injury as true, weighs in his favor. Although no particular quantum of injury is required (*Wilkins v. Gaddy*, 599 U.S. 34, 37 (2010)), the extent of injury is an important factor courts assess in determining whether the amount of force used on a pretrial detainee was reasonable. *See Kingsley*, 576 U.S. at 397. According to Welsh, he "was treated for pain and chemical burns" and "had [his] eyes flushed because [he] had a hard time seeing."

Questionnaire 6. The pain and "partial blindness" remained for two weeks, in addition to nightmares lasting for months and continued anxiety and difficulty breathing.[11] *Id.* On the one hand, "[c]ourts have held the normal effects of being sprayed with pepper spray are *de minimis*." *Amos v. Jefferson*, No. 5:17cv195, 2019 WL 950367, at *9 (E.D. Tex. Feb. 27, 2019) (collecting cases), *aff'd*, 861 F. App'x 596 (5th Cir. 2021); *accord Brooks*, 2021 WL 4458380, at *13 ("The Fifth Circuit has held that the expected effects of being pepper sprayed constitute a *de minimis* injury."); *Williams v. United States*, No. H–08–2350, 2009 WL 3459873, at *13 (S.D. Tex. Oct. 20, 2009) (considering de minimis allegations that plaintiff "suffered 'severe bruising and scrapes upon his body' and 'extreme pain from being kicked and sprayed in the eyes with pepper spray'"). Yet Welsh also alleges long-term effects. *See Cornett v. Ward*, No. 3:18-CV-1395-S, 2020 WL 906290, at *1 (N.D. Tex. Feb. 25, 2020) ("Where injuries from taser or pepper spray are concerned, a plaintiff must allege some long-term effect and not mere pain."). This factor therefore supports Welsh's claim.

The remaining factors, however, suggest that the force was not objectively unreasonable. Welsh admits he repeatedly refused to extract himself from the recreation yard gate and return to his room, despite multiple directives from officers to do so. *See* Compl. 12–13; Questionnaire 5–6. Welsh's conduct thus justified the use of *some* degree of force. *See, e.g.*, *Sanchez v. Griffis*, 569 F. Supp. 3d 496, 518 (W.D. Tex. 2021) ("Courts have recognized that a pretrial detainee's refusal to comply with repeated orders justifies the use of some degree of force by officers."); *Calhoun v. Wyatt*, No. 6:11cv4, 2013 WL 1882367, at *6 (E.D. Tex. May 2, 2013) (noting that inmate's refusal to obey orders "set the stage for the use of force"); *Rushing v. Simpson*, No.

---

[11] Welsh does not specifically differentiate between the injuries suffered due to this "personal" chemical spray versus the stronger "riot spray" used earlier. Questionnaire 6. Because Welsh avers this final administration was directed toward his eyes, the Court primarily focuses on the allegations concerning his eyesight. *See id.*

4:08CV1338 CDP, 2009 WL 4825196, at *7 (E.D. Mo. Dec. 11, 2009) (citing cases for support) (explaining that plaintiff's (a detainee awaiting civil commitment determination) refusal to comply with orders, "after almost seven minutes of being asked to do so by multiple staff members, justified the use of force"). Significantly, this last petulant outburst and refusal to follow orders occurred after *multiple* instances of outright defiance to security's efforts to control Welsh and maintain institutional control.[12]

Disobeying orders poses a threat to the order and security of an institution as well as safety concerns for Welsh. *See Moss v. Brown*, No. 2:09–CV–0110, 2012 WL 1033475, at *9 (N.D. Tex. Mar. 12, 2012) ("A prisoner does not have the right to refuse to comply with orders and then claim that actions taken in response to his refusal were maliciously done."), *R. & R. adopted by* 2012 WL 1037449 (N.D. Tex. Mar. 28, 2012); *Minix v. Blevins*, No. 6:06cv306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007) (citation omitted) (recognizing that even where inmate believes order to be unjustified or improper, such belief does not give him the right to disobey at his whim); *Rios v. McBain*, No. 504CV84, 2005 WL 1026192, at *7 (E.D. Tex. Apr. 28, 2005) (noting that "open defiance of orders plainly poses a threat to the security of the institution, regardless of whether or not the defiance is emanating from within a locked cell"); *see also Whitehead v.*

---

[12] *See* Compl. 8–13; Questionnaire 2–8; Video 1 00:24–02:48; Video 2 03:05–07:59, 11:00–16:43; Video 3 00:02–3:43; Video 4 01:17–08:50; Video 6 03:14–21:19 (recalcitrance began when Welsh initially ignored several orders to remove his room's window covering, causing security personnel to call for a compliance team; once he removed the covering, Welsh refused to submit to hand restraints despite multiple orders and warnings that security would escalate to chemical agents; security staff sprayed the chemical agent, but to no avail; Welsh then ignored several more orders and warnings, resulting in a five-man security team entering the room; Welsh scattered papers across the floor, fought against the security team, and removed Chavez's helmet; security staff subdued Welsh, cuffed his hands and feet, and moved him to another room; Welsh refused to relinquish the hand restraints and security allowed him to keep the cuffs for approximately two hours; upon security's return, Welsh again ignored repeated orders and warnings; security utilized a chemical agent and Welsh relinquished the cuffs; Officers Williams and Doe allowed Welsh out of his room with handcuffs to record his account of the incident with Chavez, and Welsh thereafter refused to comply with security's orders to return to his room; security allowed Welsh to remain in the hallway and Welsh took the opportunity to run to the recreation yard and tether himself to the fence; security attempted to induce compliance through negotiation, orders, and warnings, but Welsh maintained his resistance; eventually, security gave Welsh a final opportunity to comply before escalation to the chemical agent, counted to three, and then administered the agent).

*Lamour*, No. 2:12–cv–197–FtM–29DNF, 2014 WL 6065865, at *6 (M.D. Fla. Nov. 12, 2014) ("The need to curtail potentially violent conduct is an 'obligation' incumbent upon the operators of the [civil commitment center].").  As such, there is a sufficient basis for an officer to believe that some use of force was objectively reasonable due to the threat presented by Welsh's repeated refusal to follow orders.  *See Martin v. Live Oak Cnty. Jail*, No. 2:22-CV-00156, 2023 WL 2874461, at *12 (S.D. Tex. Jan. 23, 2023) ("[O]pen defiance of orders, such as that exhibited by [p]laintiff, would lead a reasonable officer in [defendant's] position to believe that some quantum of force was objectively reasonable."), *R. & R. adopted by* 2023 WL 2873382 (S.D. Tex. Apr. 10, 2023); *Amerson v. Sollie*, No. 3:18-cv-535-DPJ-FKB, 2021 WL 4205657, at *4 (S.D. Miss. Sept. 15, 2021) (considering force "objectively reasonable" where officer warned pretrial detainee that he would be sprayed and detainee deliberately disobeyed); *Abdullah v. Texas*, No. A-18-CA-1076-LY, 2019 WL 981942, at *5 (W.D. Tex. Feb. 27, 2019) (finding no constitutional violation where pretrial detainee "admit[ted] the pepper spray was used in response to [p]laintiff kicking the door after he had been warned to stop"), *R. & R. adopted by* 2019 WL 13333984 (W.D. Tex. May 10, 2019); *see also Bell v. Wolfish*, 441 U.S. 520, 561 (1979) ("Ensuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both.").  Thus, the fourth, fifth, and sixth *Kingsley* factors (i.e., the severity of the security problem at issue, the threat to institutional order reasonably perceived by the officer, and plaintiff's active resistance) weigh heavily in favor of finding that the use of force was objectively reasonable, particularly in light of the continuing defiance demonstrated by Welsh and the resulting disruption of institutional control it caused.  *See Kingsley*, 576 U.S. at 397.

The first and third *Kingsley* factors—i.e., any effort made by the officer to temper or limit the amount of force and the relationship between the need for the use of force and the amount of

force used—similarly weigh against Welsh. Welsh concedes, and the video confirms, that MTC personnel warned Welsh that they would use the chemical spray if he did not submit to their directives. *See* Questionnaire 6. The video shows that Welsh had tied himself around the fence and refused orders for at least twenty minutes before the security team administered the chemical spray. *See* Video 6 12:31; Video 9 15:02. Despite the repeated warnings, Welsh nevertheless insisted that he would not comply because he disagreed with the orders. Video 6 09:41–14:33; *see* Compl. 12–13; Questionnaire 6. And this defiance came after repeated, deliberate refusals by Welsh to comply with other previous orders given by facility personnel (who used varying degrees of force in unsuccessful attempts to gain his compliance), which inevitably led to this final incident. Under the circumstances, the Court cannot conclude that MTC personnel made no effort to limit the amount of force or employed force disproportionate to the need. *See Vetcher v. Unknown Immigrs. & Customs Enf't Supervisors*, No. 3:19-CV-811-C-BK, 2020 WL 6877698, at *3–4 (N.D. Tex. Nov. 3, 2020) (concluding plaintiff offered "no facts to plausibly suggest that the force used was objectively unreasonable" in part because officer "opted to use chemical spray to gain compliance" in response to immigration detainee's "repeated refusal"), *R. & R. adopted by* 2020 WL 6873608 (N.D. Tex. Nov. 23, 2020); *Grandpre v. Gusman*, No. 17-8935-DEK, 2018 WL 3632364, at *6 (E.D. La. July 31, 2018) ("Rather than engaging in forceful physical contact, [defendant] used chemical spray to gain compliance. It is clear that a limited application of chemical spray to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force." (citation and quotation marks omitted)); *Thompson v. Beasley*, 309 F.R.D. 236, 249 (N.D. Miss. 2015) ("The issuance of verbal orders constitutes an effort made to temper the severity of a forceful response.").

On balance, Welsh's allegations do not demonstrate that the alleged force was objectively unreasonable. Officers Williams and Doe cannot be liable under a bystander liability theory without an underlying constitutional violation. *See Sligh v. City of Conroe*, 619 F. Supp. 3d 735, 742 (S.D. Tex. 2022); *Spencer v. Rau*, 542 F. Supp. 2d 583, 594 (W.D. Tex. 2007). Moreover, Welsh's allegations fail to show that the officers acquiesced in any constitutionally excessive force. That is, Welsh pleads no facts to show Williams and Doe *knew* MTC guards were violating his constitutional rights. *See Hamilton*, 845 F.3d at 663; *Frakes v. Masden*, No. H-14-1753, 2015 WL 7583051, at *10 (S.D. Tex. Nov. 25, 2015) ("Because the force being used was neither clearly excessive nor objectively unreasonable, there is nothing to suggest that [bystander] knew [officer] was violating [plaintiff's] constitutional right to be free from the use of excessive force."), *aff'd*, 668 F. App'x 130 (5th Cir. 2016).

Welsh tries to bootstrap his bystander liability claim by arguing that Officers Williams and Doe had a sufficient basis to understand why he refused to comply with MTC orders, thereby apparently creating a constitutional duty to intervene. *See* Questionnaire 7 (alleging Defendants knew the room was contaminated with chemical spray, knew Schmoker refused to allow him cleaning supplies, knew his clothing was "saturated" with the spray, knew the water had been shut off, knew he was in the room "for an extended period"). But Welsh's disagreement with the order to return to his room does not justify his defiance, nor does it create any duty on the officers' part to act. *See Dillon v. Moore*, No. H-17-0204, 2018 WL 2317700, at *5 (S.D. Tex. May 22, 2018) ("Use of force is considered an appropriate response where an inmate refuses to obey repeated orders."). He pleads little facts addressing the operative question, i.e., whether the officers knew the use of a chemical agent in the face of that defiance violated Welsh's constitutional rights.

Welsh specifically argues that Defendants "knew TCCC staff are not law enforcement" and "knew Welsh was already handcuffed and bound within a fence [and] therefore presented less of a threat." Questionnaire 7. These facts, however, do not undermine the force analysis under *Kingsley* as set forth above. *See Gibson v. Scaturo*, No. 2:13–3134–MGL, 2015 WL 4744563, at *8 (D.S.C. Aug. 11, 2015) ("The law does not require that [an SVP] must act with violence before officers may restrain him."); *Calhoun*, 2013 WL 1882367, at *6 ("Inmates do not have a right to cause disturbances creating a security problem nor to comply with orders from jail officials."). At most, Welsh contends Williams and Doe "knew or should have [known] that MTC was not operating under the scope of the contract or under Texas Health and Safety Code 841.0838" and that "force outside the statutory or contractual grant of power to MTC by the state is an assault under state law." Questionnaire 7. Welsh does not, however, support these conclusory allegations. *Cf. Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (per curiam) (concluding district court properly dismissed claims where plaintiff's allegations were "not sufficient to show that either [defendant] knew that the other officers did not have lawful authority to enter [plaintiff's] home, as is required to establish bystander liability"); *Ramirez v. Killian*, No. 2:18-CV-107-Z-BR, 2019 WL 6352751, at *9 n.11 (N.D. Tex. Aug. 20, 2019) ("Absent a showing by the Plaintiffs that Sheriff Riley knew the force used was excessive at the time he failed to separate Deputy Killian and Plaintiff Ramirez, Sheriff Riley had no duty to intervene."), *R. & R. adopted by* 2019 WL 6352779 (N.D. Tex. Nov. 27, 2019); *Miller v. City of E. Mountain*, No. 2:17-cv-00496-JRG-RSP, 2019 WL 1294280, at *1 (E.D. Tex. Mar. 21, 2019) (dismissing bystander claim because plaintiff had "not provided any facts to show how [defendant] had any knowledge that . . . [plaintiff's] arrest was unlawful").

Moreover, "[v]iolation of local law does not necessarily mean that federal rights have been invaded." *Paul v. Davis*, 424 U.S. 693, 700 (1976) (citation omitted); *see Reyes v. Bridgwater*, No. 5:08-CV-056-C, 2010 WL 11534478, at *2 (N.D. Tex. June 21, 2010) ("[T]he Constitution is not a vehicle to remedy violations of duties arising under state law."). Rather, the excessive force inquiry requires courts to "ask whether defendants' conduct independent of its lawfulness or unlawfulness at state law was sufficiently egregious as to be 'constitutionally' tortious." *Williams v. Kelley*, 624 F.2d 695, 697–98 (5th Cir. 1980) (affirming dismissal of excessive force claim where "defendants did not act constitutionally" without reaching "whether, as a matter of state law, defendants' conduct was lawful or unlawful"). What is more, bystander liability depends on an officer's knowledge that "a *constitutional* violation was taking place." *Hamilton*, 845 F.3d at 663 (emphasis added). Thus, Welsh cannot state a claim based only on Defendants' alleged knowledge that MTC personnel acted beyond their contractual or state statutory authority.[13] *Cf. Covarrubias v. Wallace*, No. 6:12cv156, 2013 WL 841378, at *1 (E.D. Tex. Mar. 6, 2013) (dismissing claim because plaintiff had "not shown that [bystanders] knew that [officer] was violating [plaintiff's] constitutional rights").

---

[13] Welsh generally contends he has "a state created liberty interest" in the contract and TEX. HEALTH & SAFETY CODE § 841.0838 and that the Fourteenth Amendment protects his interest "not to be denied without procedural process." Questionnaire 8. He does not otherwise articulate the precise alleged liberty interest, nor does he articulate the process he believes he should have been given. *See id.* Welsh does note, however, that the statute permits the use of chemical force "when used as a last resort" and when "necessary to stop or prevent imminent physical injury to the committed person or another." *Id.* at 7; *see* § 841.0838(a)(2)(A)–(B).

"Although freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' that liberty interest is not absolute." *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) (internal citation omitted). "Due process requires only that 'the conditions . . . bear some reasonable relation to the purpose for which persons are committed.'" *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (per curiam) (citation omitted). Welsh "has not sufficiently alleged how [the challenged conduct] lacked a reasonable relation to Texas's twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Id.* (citation omitted). Insofar as Welsh invokes procedural due process, Welsh was given multiple warnings and was afforded several minutes to comply; he "does not suggest, and, in light of [his] continued resistance, this Court cannot imagine, what lesser type of force would have been effective here." *Grandpre*, 2018 WL 3632364, at *6.

In sum, Welsh has not raised a viable bystander liability claim because his allegations do not rise to the level of a constitutional violation and he has not alleged that Officer Williams and Officer Doe knew of such violation and chose not to intervene. The undersigned therefore recommends the district judge dismiss Welsh's claim.

### C. The district judge should dismiss Welsh's "Fourteenth Amendment False Charges" claims because his allegations do not implicate the Fourteenth Amendment.

Welsh claims Officer Williams violated his Fourteenth Amendment rights in connection with the criminal investigation in cause no. DCR-6076-20.[14] Compl. 29–32. Welsh also seeks to hold Defendants Say, Redman, Doe, Schmoker, the County, and the City responsible for the alleged filing of false charges, in violation of the Fourteenth Amendment. *Id.* at 31–32.

Challenges to an arrest or detention ordinarily arise under the Fourth Amendment. *See, e.g.*, *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017) (analyzing a claim for "unreasonable" detention under the Fourth Amendment where plaintiff alleged he was detained "based solely on false evidence, rather than supported by probable cause"); *Winfrey v. Rogers*, 901 F.3d 483, 491–92 (5th Cir. 2018) (concluding that plaintiff's "claim that he was wrongfully arrested due to the knowing or reckless misstatements and omissions in [defendant's] affidavits" was properly analyzed under the Fourth Amendment, and reviewing cases in support); *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003) (en banc) ("The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example . . . ."); *see also Candee v. Maldonado*, No. H-21-2538, 2022 WL 2342571, at *4 (S.D. Tex. June 28, 2022) (analyzing false

---

[14] Welsh unequivocally brings concurrent claims under both the Fourth and Fourteenth Amendments. Because he specifically delineates the arguments in support of each, even though there may be some overlap between the two, the Court examines his allegations separately as pleaded. The Fourth Amendment claim is addressed in Section III.D.

arrest claim under the Fourth Amendment); *Escamilla v. Dall. Police Dep't*, No. 3-01-CV-1159-G, 2001 WL 1338302, at *2–3 (N.D. Tex. Oct. 18, 2001) (same).

As to possible claims Welsh could assert under the Fourteenth Amendment, the Fifth Circuit has recognized a fabrication-of-evidence claim.  *See Cole v. Carson*, 802 F.3d 752, 765–74 (5th Cir. 2015) (recognizing a substantive due process claim based on plaintiffs' allegation that police deliberately fabricated evidence "to get [arrestee] charged to cover an unlawful use of force," where the Fourth Amendment provided no recourse for plaintiffs), *vacated sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016), *opinion reinstated in relevant part*, 935 F.3d 444 (5th Cir. 2019) (en banc); *see also Morgan v. Chapman*, 969 F.3d 238, 250 (5th Cir. 2020) (recognizing that "although *Cole* had a peripatetic procedural history," the court's holding "that there is a 'due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person'" remains "binding Fifth Circuit precedent today" (quoting *Cole*, 802 F.3d at 771)).  In *Cole*, the Fifth Circuit confirmed that "there is no 'substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause.'"  802 F.3d at 765 (quoting *Albright v. Oliver*, 510 U.S. 266, 268 (1994)).  Nevertheless, the court held that "[w]here police intentionally fabricate evidence and successfully get someone falsely charged with a felony as cover for their colleagues' actions, *and the Fourth Amendment is unavailing*, there may be a due process violation."  *Id.* at 773 (emphasis added)).

To succeed on a fabrication-of-evidence claim under the Fourteenth Amendment, a plaintiff "must show (1) the officers fabricated evidence (2) for the purpose of falsely obtaining a charge and (3) that the evidence influenced the decision to charge."  *See Cole v. Hunter*, 497 F. Supp. 3d 172, 190 (N.D. Tex. 2020).  The plaintiff must, however, "make more than conclusory allegations."  *Guillory v. Dalbour*, No. 2:15-cv-02452, 2016 WL 5415072, at *5 (W.D. La. Sept.

27, 2016). Indeed, vague and non-specific allegations of wrongdoing are insufficient to support a § 1983 claim. *See Sias v. Louisiana*, 146 F. App'x 719, 720 (5th Cir. 2005) (per curiam) (holding that vague and conclusory allegations provide an inadequate basis for § 1983 claims); *Richards v. Johnson*, 115 F. App'x 677, 678 (5th Cir. 2004) (per curiam) (same); *Lloyd v. Jones*, No. 9:18-CV-211, 2019 WL 4786874, at *6 (E.D. Tex. Sept. 10, 2019) ("The Court does not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010))). The plaintiff must instead provide "supporting factual detail" such as "how [the fabrication] was material or harmful to [the] case" and why he "believes it to be fabricated." *Armstrong v. Ashley*, 60 F.4th 262, 272 (5th Cir. 2023).

For the reasons set forth below, Welsh fails to state a viable claim under the Fourteenth Amendment against any Defendant.

### 1. Officer Williams

Welsh claims Officer Williams violated the Fourteenth Amendment in the following ways: (1) bringing a felony charge under Tex. Penal Code § 22.01(b-1) "when at best he only had evidence of a misdemeanor"; (2) presenting "a bare bones statement for probable [cause] with no objective indicia that Chavez operated under the scope of the contract"; (3) continuing "with the charges of felony assault after knowing that he did not have probable cause"; (4) overlooking "evidence that would have exonerated Welsh" (i.e., the contract, force video, and Tex. Health & Safety Code 841.0838) because Chavez did not act "under the scope of the contract because he never acted in self defense"; (5) failing to report inconsistencies in Chavez's statement and/or "clean[ing] up Chavez['s] statements to make them sound more believable"; and (6) investigating despite knowledge that "he did not have jurisdiction." Compl. 31–32; Questionnaire 27–31.

As discussed above, the Fifth Circuit has recognized a possible due process violation "[w]here police intentionally fabricate evidence and successfully get someone falsely charged with a felony as cover for their colleagues' actions." *Cole*, 802 F.3d at 773. But Welsh does not purport to raise fabrication-of-evidence claims and instead invokes the Fourteenth Amendment in support of his assertion of "false charges." Compl. 31–32. Indeed, Welsh's allegations do not involve fabrication of evidence and instead largely amount to probable cause challenges based on his interpretation of state law authorizing force at the TCCC, which cannot support a due process claim. *Cf. Albright*, 510 U.S. at 271–75 (holding that there is no substantive due process right to be free from criminal prosecution supported by probable cause); *Forbes v. Harris Cnty.*, No. H-17-2256, 2019 WL 2085670, at *5 (S.D. Tex. May 13, 2019) ("The Fourth Amendment, not the Fourteenth Amendment's due-process clause, applies" to claim that officer "misrepresented the basis for probable to issue a blood draw warrant in his warrant application affidavit."), *aff'd*, 804 F. App'x 233 (5th Cir. 2020); *Saturn v. Barnett*, No. A–16–CA–505–LY, 2016 WL 7392240, at *3 (W.D. Tex. Dec. 20, 2016) ("The right to be free from arrest absent probable cause is protected under the Fourth Amendment, and therefore it generally cannot be brought as a Fourteenth Amendment due process claim."), *R. & R. adopted by* 2017 WL 9850919 (W.D. Tex. Jan. 12, 2017).

Stated differently, Supreme Court and Fifth Circuit precedent preclude Welsh's Fourteenth Amendment claims because the Fourth Amendment is the explicit textual source against the alleged conduct. *See Manuel*, 580 U.S. at 364–68 (concluding that the Fourth Amendment—not the due process clause—is the source of the applicable right where a person is criminally charged based on a police officer's false statements); *Winfrey*, 901 F.3d at 492 ("[T]he Fourth Amendment is the appropriate constitutional basis for [plaintiff's] claim that he was wrongfully arrested due to

the knowing or reckless misstatements and omissions in [officer's] affidavits."). "*Cole* essentially created an exception to this general rule in cases where officers fabricate facts to support a criminal charge," *McLean v. Davis*, No. 3:22-CV-33-DPJ-FKB, 2023 WL 1868192, at *4 (N.D. Miss. Feb. 9, 2023), but Welsh makes no such allegation. Welsh cannot establish a Fourteenth Amendment claim based on allegations that do not involve fabrication of evidence because he fails the first prong of the *Cole* test. *See Armstrong*, 60 F.4th at 272 (concluding "district court properly dismissed" claim where "the allegations d[id] not 'plausibly suggest' that fabrication actually occurred"); *Robles v. Ciarletta*, 797 F. App'x 821, 832 (5th Cir. 2019) (per curiam) (affirming dismissal of Fourteenth Amendment claim where plaintiff did "not argue that [defendant's] report indicate[d] the fabrication of facts"); *Jones v. Perez*, No. 3:16-CV-2835-D, 2017 WL 4238700, at *11 (N.D. Tex. Sept. 25, 2017) (finding *Cole* "inapplicable" where plaintiff "fail[ed] to cite any evidence of deliberate fabrication" at summary judgment), *aff'd*, 790 F. App'x 576 (5th Cir. 2019); *Rios v. City of Corpus Christi*, No. 2:14–CV–00409, 2017 WL 432886, at *3 (S.D. Tex. Feb. 1, 2017) (granting motion to dismiss because "[a] Fourteenth Amendment violation requires the knowing use of false testimony or knowing use of manufactured evidence" (emphasis omitted)).

Welsh comes closest to raising a Fourteenth Amendment violation by asserting that Officer Williams "cleaned up Chavez['s] statements to make them sound more believable." Compl. 31. Beyond this general statement, however, Welsh provides no supporting facts. *See id.* He does not (1) identify the ways in which Williams "cleaned up" the statement (omitting, altering, adding, etc.), (2) allege how it was material or harmful to his case, or (3) otherwise articulate the basis for his belief that it was done deliberately. *See Armstrong*, 60 F.4th at 271–73. Thus, this too fails to bring Welsh's allegations within the "narrow class" of actionable cases under the Fourteenth Amendment. *See Jones*, 790 F. App'x at 582 (finding *Cole* inapplicable and noting that the officer

"may have presented the evidence against [plaintiff] in far too rosy a light, but she did not make it up out of whole cloth such that her attempt to obtain the warrant would 'shock the conscience'" (citation omitted)); *cf. McCullough v. Herron*, 838 F. App'x 837, 843 (5th Cir. 2020) (per curiam) ("An inconsistency in an affidavit, along with assertions that [investigator] should have done more . . . before reaching her conclusions, do not amount to evidence of 'arbitrary or conscience-shocking' conduct" sufficient to "violate [plaintiff's] Fourteenth Amendment substantive due process rights."); *Rogers v. Lee Cnty.*, 684 F. App'x 380, 390 (5th Cir. 2017) (affirming dismissal of due process claim at summary judgment where evidence showed "at most negligence or incompetence rather than a conscience-shocking intent to lie about, misrepresent, or fabricate evidence").  Accordingly, the undersigned recommends that Welsh's due process claim against Defendant Williams be dismissed.

> ### 2. DA Say, ADA Redman, Officer Williams, Officer Doe, Chief Hester, Administrator Schmoker, Lamb County, and the City of Littlefield

Welsh attempts to raise an additional due process claim because he believes DA Say, ADA Redman, Officer Williams, Officer Doe, LPD Chief Hester, and Administrator Schmoker "communicate[d] with each other on how to proceed with the false criminal charges."  Compl. 32. He contends they discussed "how to over charge" him "during the investigative phase" in order "to cover-up the criminal assault by" MTC guards.  *Id.*

Welsh bases his claim on the following factual assertions:  (1) Schmoker spoke with Say and Redman before he called the police and "they recommended that the police be called and criminal charges be pressed"; (2) Redman told Welsh TCCC staff are allowed to use force against him; (3) Say told Welsh he charged him "because [Welsh] [is] a sex offender"; (4) Redman said Welsh "need[ed] a little more time in prison to cool off"; (5) Welsh told them they had "no hope of getting a felony to stick because security was not acting within the scope of the contract" and

Say agreed and told Welsh that they "knew that before [they] brought the charges . . . but we may still get the conviction"; (6) Schmoker, Redman, and Say "had several conversations by email and cell phone prior to the indictment"; and (7) Schmoker informed Welsh that law enforcement authorities would "not press charges on any MTC employee for the assaultive conduct" because the "law does not allow enough flexibility to enforce MTC policy," and Welsh would "suffer disciplinary repercussions" if he or his mother "continue[d] to call the Sheriff['s] Department." Questionnaire 32–33.

It appears Welsh attempts to allege a conspiracy-type fabrication-of-evidence claim under the Fourteenth Amendment. *See Cole*, 802 F.3d at 771 (recognizing a "due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person"). As with his above claim against Officer Williams, however, Welsh pleads no facts to support a *Cole* violation because he does not allege that Defendants agreed to *fabricate evidence*. *See id.* at 773. The Fourteenth Amendment cannot provide Welsh relief because any assertion that Defendants "over charged" him falls under the Fourth Amendment, which "establishes the minimum constitutional 'standards and procedures'" for arrest and detention. *Manuel*, 580 U.S. at 365 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

### D. Welsh's allegations do not show that Officer Williams tainted the intermediaries' probable cause determinations.

Welsh asserts that Officer Williams violated the Fourth Amendment by initiating "false criminal charges under Texas Penal Code 22.01(b-1)" and making "reckless misstatements" and "reckless omissions of fact[]" to the magistrate and grand jury. Compl. 29–30.

"The Fourth Amendment does not guarantee that only the guilty will be arrested." *Brown v. Simmons*, No. 4:04-CV-871-A, 2005 WL 1131084, at *5 (N.D. Tex. May 11, 2005) (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). Welsh must show that there was no probable cause

to support the arrest and detention.  *See Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) ("The 'constitutional torts' of false arrest . . . and false imprisonment . . .  require a showing of no probable cause." (citation omitted)).  "Probable cause is not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and citations omitted).  It "exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'"  *Haggerty*, 391 F.3d at 655–56 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)).  "Probable cause is analyzed under the totality of the circumstances," and there is no requirement that "the officer's belief . . . be correct [or] more likely true than false."  *Herron v. Lew Sterrett Just. Ctr.*, No. 3:07-CV-0357-N, 2007 WL 2241688, at *3 (N.D. Tex. Aug. 6, 2007) (citing *Branch v. City of Dallas*, No. 95-10240, 1995 WL 581999, at *1 (5th Cir. Sept. 28, 1995)).  "Rather, the probable cause analysis only requires that [the Court] find a basis for an officer to believe to a 'fair probability' that a violation occurred." *Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000) (per curiam) (citation omitted).  "'[F]air probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999).

"A grand jury indictment is sufficient to establish probable cause."  *Russell v. Altom*, 546 F. App'x 432, 436 (5th Cir. 2013) (per curiam).  Moreover, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party."  *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (per curiam) (citation omitted); *accord Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) ("[A] properly secured arrest warrant or grand jury indictment will

shield a defendant who has committed or initiated a false arrest."). The independent-intermediary doctrine is not, however, absolute. *Anokwuru v. City of Houston*, 990 F.3d 956, 963–64 (5th Cir. 2021). This doctrine can be overcome where "the deliberations of that intermediary were in some way tainted by the actions of the defendant." *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988); *accord Allen v. Jackson Cnty.*, 623 F. App'x 161, 162 (5th Cir. 2015) (per curiam) ("Because, a judge issued an arrest warrant, a grand jury returned an indictment, and after a *habeas corpus* hearing, a second judge found 'sufficient probable cause' supporting his arrest, [plaintiff] rightly concedes he must show that the deliberations of these intermediaries 'were in some way tainted by the actions of the defendant.'" (citation omitted)). A plaintiff can establish the process was tainted where: (1) the officer obviously failed to present accurate evidence "to support the probable cause required for the issuance of a warrant"—i.e., a *Malley* violation; or (2) "officers . . . deliberately or recklessly provide[d] false, material information for use in an affidavit or . . . ma[de] knowing and intentional omissions that result[ed] in a warrant being issued without probable cause"—known as a *Franks* violation. *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020) (internal quotation marks and alterations omitted) (quoting *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc)).

More specifically, an officer commits a *Malley* violation where an affidavit in support of a warrant request is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)). "The *Malley* wrong is not the presentment of false evidence, but the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Id.* (quoting *Melton*, 875 F.3d at 264). The question courts must ask in evaluating a *Malley* claim "is whether a reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to

establish probable cause and that he should not have applied for a warrant." *Id.* (quoting *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989)).

Under *Franks*, conversely, a plaintiff's "Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Winfrey*, 901 F.3d at 494 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The warrant requirement is intended to permit "the magistrate to make an independent evaluation of the matter." *Id.* (quoting *Franks*, 438 U.S. at 165). To this end, affiants must "'set forth particular facts and circumstances underlying the existence of probable cause,' including those that concern the reliability of the information and the credibility of the source to avoid 'deliberately or reckless false statements.'" *Id.* (alteration omitted) (quoting *Franks*, 438 U.S. at 165). To ultimately determine taint, "*Franks* requires the court to determine whether, excluding such errors and omissions, the remaining 'corrected affidavit' establishes probable cause." *Terwilliger v. Reyna*, 4 F.4th 270, 283 (5th Cir. 2021).

The Fifth Circuit has explained that "mere allegations of taint" may be sufficient to state a claim, provided that "the complaint alleges other facts supporting the inference." *McLin v. Ard*, 866 F.3d 682, 690 (5th Cir. 2017) (internal quotation marks omitted); *see Terwilliger*, 4 F.4th at 283 ("*Franks*, of course, requires more than bare assertions of falsehood."). The court has further stated that if a plaintiff "wish[es] to establish a *Franks* violation, or, similarly, wish[es] to establish the taint exception to the independent intermediary doctrine, they must point to omitted or misrepresented *facts*, not legal conclusions." *Wilson*, 33 F.4th at 213 n.8.

### 1. *Malley*

A state magistrate judge found probable cause for Welsh's criminal charge under Tex. Penal Code § 22.01(b-1)(2)(B), and a grand jury thereafter indicted him for the same.

Questionnaire 9.  Welsh attempts to overcome these determinations by raising a *Malley* violation based on Officer Williams's purportedly deficient probable cause affidavit and testimony before the grand jury.  Compl. 29; Questionnaire 9–11, 14.  He contends Williams "made no mention of the [TCCO/MTC] contract in his probable cause statement," or other information that "could also show Chavez acted without lawful authority."  Questionnaire 10.

Authenticated records show, and Welsh agrees, that Officer Williams's probable cause affidavit reads as follows:

> On 9-15-2020 at approximately 1624 I was dispatched to the Texas Civil Commitment Center when I arrived at the TCCC 2600 South Sunset Ave, I received a statement from security officer Julian Chavez who explained to me that resident Lonnie Kade Welsh had assaulted him.  He stated Lonnie had covered up the window to his room, which is not allowed in the facility so staff may do welfare checks on the residents. When instructed to clear the window, Lonnie refused, and instead threw papers all over his floor in order to make the floor slippery, as well as place a bucket near the entrance.  The security team, sprayed gas into the room, but that was not effective as they intended, due to Lonnie using a shirt to block the food opening they were using.  The security team breached the room, with the lead man, Officer Chavez holding a riot shield entering first.  As they entered the room, Lonnie grabbed Officer Chavez' helmet and ripped it off of him and scratching the top of his left eye, causing him pain and bodily injury.  When I spoke to Lonnie about the incident, he admitted verbally and in a written statement that he took Officer Chavez' helmet off.  Lonnie Welsh was arrested for assault on a security officer and taken to Lamb County Jail at approximately 1900.

*Id.* at 9, 14.

A person commits criminal assault under Texas law if he "intentionally, knowingly, or recklessly causes bodily injury to another," "intentionally or knowingly threatens another with imminent bodily injury," or "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative."  TEX. PENAL CODE § 22.01(a)(1)–(3).  Assault is a Class A misdemeanor, except that it is a third degree felony if the offense is committed:  (1) while the actor is committed to a civil commitment facility; and (2) against "a person who contracts with the state to perform a

service in a civil commitment facility or an employee of that person" either (i) "while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by the state to provide the service," or (ii) "in retaliation for or on account of the person's or employee's performance of a service within the scope of the contract." *Id.* § 22.01(b-1)(1)–(2).

To the extent that Welsh contends the probable cause affidavit on its face fails to establish probable cause of an assault, the Court easily rejects this claim because the affidavit states that Welsh admitted having removed Chavez's helmet, which Chavez reported to have caused pain and injury. *See Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *10 (5th Cir. Apr. 20, 2023) (unpublished) (holding that "there was probable cause to arrest" plaintiff for assault where "the officers were attempting to control an unruly, disobedient, combative crowd and [plaintiff] interfered with that objective, did not follow directives, and yelled and flailed her arm in close proximity to the officer's person, and then continued to flail her arms upon contact"); *Glass v. City of Gainesville*, No. 4:09–cv–189, 2009 WL 2632801, at *4 (E.D. Tex. Aug. 25, 2009) (granting motion to dismiss on Fourth Amendment claim because "officers were provided with statements from the victims of the alleged assaults" and plaintiff "admit[ted] to having intentionally caused physical contact with the alleged victims," which established probable cause for assault under TEX. PENAL CODE § 22.01(a)(3)); *Nelson v. City of Watauga*, No. 4:03–CV–142–BE, 2003 WL 22329013, at *3 (N.D. Tex. Oct. 7, 2003) (concluding "officers could reasonably have believed they had probable cause to arrest [plaintiff] for assaultive conduct" under Texas law where plaintiff "struck [an officer], who was in uniform, and the paramedic responding to a 9–1–1 call, and that this contact was witnessed by [a second officer]").

So, too, concerning the assertion that the affidavit failed to offer facts in support of the felony enhancement. Welsh acknowledges that the altercation occurred while he was confined at the TCCC and that Defendant Chavez is employed by a corporation that contracts with the state to perform security at the facility. *See* Compl. 8–9; Questionnaire 20. He merely challenges the legal conclusion that Chavez was acting within the scope of the contract during the alleged assault. *See* Compl. 29; Questionnaire 10 (claiming that Officer Williams failed to "in any way cite to the provision of the contract to establish that Chavez was indeed acting under its scope"). The gravamen of this argument is that the contract between TCCO and MTC did not authorize the force used against Welsh, meaning that Chavez could not have been acting within the scope of the contract when Welsh took off his helmet, which in turn defeats an element of the charged offense and/or establishes that Welsh was acting in self-defense. *See, e.g.*, Questionnaire 3–4, 10, 12. This theory, even if true, does not fall within *Malley*.

The primary question "is whether a reasonably well-trained officer . . . would have known that his affidavit failed to establish probable cause." *Mayfield*, 976 F.3d at 487. The probable cause affidavit states that the assault occurred after Defendant Chavez entered Welsh's room at the TCCC as a member of a security team in response to a resident compliance issue. *See* Questionnaire 9. These facts are sufficient to support a reasonable belief that the assault occurred while Chavez was engaged in a service provided within the scope of his contract. *See Gates*, 462 U.S. at 243 n.13 ("[Probable cause] requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); *Piazza*, 217 F.3d at 246 (recognizing that "the probable cause analysis only requires that [the Court] find a basis for an officer to believe to a 'fair probability' that a violation occurred"); *Rakun v. Kendall Cnty.*, No. SA-06-CV-1044-XR, 2007 WL 2815571, at *14 (W.D. Tex. Sept. 24, 2007) ("Probable cause to justify an arrest means facts

and circumstances *within the officer's knowledge* that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (emphasis added)); *cf. Hughes v. State*, 897 S.W.2d 285, 298 (Tex. Crim. App. 1994) (rejecting argument that police officer was not lawfully discharging his duties during an unconstitutional traffic stop because the officer "was acting within his capacity as a peace officer at the time of the offense" (internal quotation marks omitted)); *Guillory v. State*, No. 14–11–00543–CR, 2012 WL 113073, at *2 (Tex. App.—Houston [14th Dist.] Jan. 12, 2012, pet. ref'd) (finding evidence sufficient to support the element that assault victim "was lawfully discharging his duties" at the time of the assault despite the "public servant's violation of a departmental policy").

Welsh essentially contends that Officer Williams should have obtained the contract, interpreted the relevant provisions, and then presented his legal analysis to the magistrate and grand jury along with the facts alleged in the probable cause affidavit. But "[t]he currency of probable cause is probability, not legal certainty." *United States v. Tinkle*, 655 F.2d 617, 621 (5th Cir. Unit A Sept. 1981). Thus, it matters not whether Welsh's legal interpretation of the law may have later proved correct. *Cf. Heien v. North Carolina*, 574 U.S. 54, 57, 61–63 (2014) (holding that "a mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold the seizure under the Fourth Amendment," and reviewing authority concluding "that reasonable mistakes of law, like those of fact, would justify certificates of probable cause"); *Cahaly v. Larosa*, 796 F.3d 399, 408 (4th Cir. 2015) (rejecting *Malley* taint claim because "officers may have probable cause to arrest based on 'reasonable mistakes of law'" (quoting *Heien*, 574 U.S. at 62)). "Whether the crime actually occurred . . . is irrelevant to the probable cause analysis." *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 754 n.10 (5th Cir. 2001). Similarly, "[o]nly conclusively

established *facts* may negate probable cause." *Lewis v. Locicero*, No. 15-00129-BAJ-RLB, 2017 WL 3928117, at *3 (M.D. La. Sept. 7, 2017) (emphasis added) (stating that the "mere assertion of an affirmative defense does not negate probable cause"). And as the Fifth Circuit has recognized, if a party "wish[es] to establish the taint exception to the independent intermediary doctrine, they must point to omitted or misrepresented *facts*, not *legal conclusions*." *Wilson*, 33 F.4th at 213 n.8 (emphasis added). Welsh has not done so.

2. *Franks*

Welsh identifies several alleged deficiencies in Officer Williams's affidavit in support of his *Franks* claim: (1) Officer Williams made "reckless misstatements of facts . . . by stating that Welsh intentionally scratched Chavez" rather than reporting "negligence and accidental conduct"; (2) Williams's "omission that Chavez was acting outside the scope of the contract"; (3) Williams failed to note Chavez's "untruthful" statement that "he had [Welsh] pinned to the wall"; (4) Williams did not inform the magistrate or grand jury "that he did not have jurisdiction to investigate or bring charges"; (5) Williams omitted facts supporting Welsh's allegation that security personnel "were the first aggressors"; (6) Williams incorrectly stated that Welsh "refused to uncover the window" to his room, despite the video evidence "clearly show[ing] the window uncovered before" security staff entered the room; (7) Williams failed to report that another security guard later sprayed Welsh with a chemical agent; (8) Williams omitted "that no other person who was present at the scene witnessed [Welsh] scratch Chavez"; (9) Williams failed to report that Welsh was later "force[d]" into a "contaminated" room; and (10) Williams did "not add the common sense that a reasonable person would state" because he omitted "that the gasmask and helmet are strapped on, therefore, [Welsh] would have to unstrap them to be able to scratch Chavez['s] face." Compl. 29–30; *see* Questionnaire 10–11, 13, 15–19.

As set forth above, a *Franks* violation occurs where "(1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Winfrey*, 901 F.3d at 494 (citation omitted). "*Franks*, of course, requires more than bare assertions of falsehood." *Terwilliger*, 4 F.4th at 283. Moreover, the Fifth Circuit has explained that "every statement in a warrant affidavit need not be 'truthful' in an absolute sense," but should instead "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 283 n.8 (quoting *Franks*, 438 U.S. at 165). Alternatively, "intentional or reckless omission of material facts from a warrant application may amount to a Fourth Amendment violation" under *Franks*. *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006). Under either theory, "*Franks* requires [courts] to" either "delete[ ] false statements and material omissions" or "insert the omitted facts," and then "ask whether the reconstructed affidavit would still support a finding of probable cause." *Winfrey*, 901 F.3d at 494–95; *Kohler*, 470 F.3d at 1113.

To begin, many of Welsh's allegations are immaterial to whether there was probable cause to support a finding that Welsh assaulted Chavez—i.e., Williams's incorrect statement about Welsh's window covering, failure to explain that an MTC guard's mask would ordinarily be strapped on, omission that guards sprayed Welsh with a chemical agent after Welsh assaulted Chavez, withholding that Welsh was later put into a contaminated room, or the alleged lack of corroborating witnesses. None of these assertions, even if true, defeat probable cause. Thus, Welsh cannot establish taint based on these claims. *See Arizmendi v. Gabbert*, 919 F.3d 891, 898 (5th Cir. 2019) ("*Franks* . . . requires the allegedly false statements to have been material to the finding of probable cause."); *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 556 (5th Cir. 2016) (stating that "alleged inconsistencies [that] are not material to the grand jury's findings

of probable cause" do not taint the intermediary's decision); *Melton v. Waxahachie Police Dep't*, No. 3:21-CV-2854-K-BH, 2022 WL 3636616, at *18 (N.D. Tex. Aug. 8, 2022) (concluding plaintiff failed to assert viable *Franks* claim where plaintiff did not show "that there were materially false statements or omissions in the affidavit underlying his arrest warrant" or "that the affidavit would fail to establish probable cause after excising any allegedly false representations and including alleged material omissions"), *R. & R. adopted by* 2022 WL 3639506 (N.D. Tex. Aug. 23, 2022).

Welsh also expresses disagreement with Officer Williams's characterization of the conduct as "intentional." Compl. 29. This allegation is immaterial for two reasons. First, Texas law instructs that a person commits criminal assault if he "intentionally, knowingly, or recklessly causes bodily injury to another," (Tex. Penal Code § 22.01(a)(1)), and probable cause therefore exists to support an assault charge so long as there is a factual basis to believe the accused acted intentionally, knowingly, *or* recklessly. *Cf. Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999) (en banc) (rejecting appellant's argument that the evidence was "insufficient to support his convictions for the intentional or knowing attempted murders" because the evidence was "sufficient to support a finding that appellant at least acted knowingly" and "when [a] jury returns a general guilty verdict on an indictment charging alternative theories of committing the same offense, [the] verdict stands if evidence supports any of the theories charged"). "'Knowing' is a less culpable mental state than 'intentional'" and requires only that one act with "aware[ness] that his conduct is reasonably certain to cause the result." *Laviage v. Fite*, 47 F.4th 402, 407 (5th Cir. 2022) (citations omitted). Recklessness, in turn, requires even less culpability. Tex. Penal Code § 6.02(d); *see* § 6.03(c) ("A person acts recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will

occur."). Moreover, despite Welsh's objection to Williams's description of his mental state, a *Franks* claim requires "omitted or misrepresented *facts*, not *legal conclusions*." *Wilson*, 33 F.4th at 213 n.8.

Similarly, and for the same reasons addressed in Section III.C.1, Officer Williams's alleged "reckless omission[] . . . that Chavez was acting outside the scope of the contract" (Compl. 30) cannot serve to taint the intermediaries' probable cause determinations. *See Wilson*, 33 F.4th at 213 n.8; *United States v. Barnes*, 126 F. Supp. 3d 735, 740–41 (E.D. La. 2015) (declining to extend "*Franks* to misstatements of law" because "no other court has" done so and "the relevant inquiry is whether the warrant affidavit contains false statements of fact." (citations and emphasis omitted)); *see also Decina v. Horry Cnty. Police Dep't*, 557 F. Supp. 3d 716, 722 (D.S.C. 2021) ("[Plaintiff's] false arrest claim [under *Franks*] is predicated on the information available to the County Magistrate when the warrant was issued not whether, in hindsight, [the officer] misapplied State law or if [plaintiff] was guilty of [the offense]."), *aff'd*, 2023 WL 2136376 (4th Cir. Feb. 21, 2023); *United States v. Tabares*, No. 1:15-CR-00277-SCJ-JFK, 2016 WL 11258758, at *19 (N.D. Ga. June 3, 2016) ("*Franks* addresses material factual misrepresentations not legal conclusions contained in an affidavit."), *R. & R. adopted by* 2017 WL 1944199 (N.D. Ga. May 10, 2017).

Neither can Welsh establish taint based on Officer Williams's failure to report Chavez's "untruthful" statement that "he had [Welsh] pinned to the wall" when Welsh removed or "took off" his helmet. Questionnaire 13. Although brief, the video footage of the encounter clearly shows that Welsh was standing near the door when the five-man team entered Welsh's room. *See* Video 2 07:19. Welsh then retreated toward the back wall, and the five guards surrounded him. Video 2 07:19–:18. While it appears Chavez did not literally hold Welsh's body against the wall, claims that are "substantially accurate" or are "merely different interpretations of events on which

there was plainly room to disagree" do not taint the resulting probable cause finding. *Buehler v. Dear*, 27 F.4th 969, 991–92 (5th Cir. 2022) (alterations and quotation marks omitted); *see Anderson v. City of McComb*, 539 F. App'x 385, 387 (5th Cir. 2013) (holding that a police officer "cannot be responsible for representing one version of the disputed facts to" an intermediary). Moreover, whether Chavez actually had Welsh pinned to the wall when Welsh "removed" his helmet is mostly, if not wholly, immaterial to whether Welsh committed an assault.

Welsh next avers that Officer Williams tainted the magistrate's and grand jury's probable cause determinations because he "omitt[ed] that he did not have jurisdiction to investigate or bring the criminal charges." Compl. 30. Accepting as true Welsh's claim that Williams acted outside of his jurisdiction, this fact nonetheless has no bearing on probable cause. *Cf. United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) (denying motion to suppress because the sheriff's deputy had probable cause to make a traffic stop despite the "state law administrative deficiency" in his authority, which did "not affect" the court's analysis under federal law); *Jackson v. Louisiana*, 980 F.2d 1009, 1011 & n.7 (5th Cir. 1993) (distinguishing between claim that an "arrest was the result of a criminal investigation which the deputy had no legal authority to conduct" and an argument "that the arrest was not supported by probable cause"); *Fields v. City of S. Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991) (concluding that officer's "arrest was valid under federal constitutional principles" because it was supported by probable cause, even though the arrest was unlawful under Texas law); *Davis v. United States*, 409 F.2d 1095, 1099 (5th Cir. 1969) (analyzing whether sheriff had probable cause to make an arrest outside his county); *Wilson v. Massey*, No. 3:20-CV-610-RPM, 2022 WL 982673, at *4 (S.D. Miss. Mar. 30, 2022) (reasoning that a "technical state law violation lack[ed] constitutional significance" because "probable cause supported the search warrant"); *Brown v. Town of DeKalb*, 519 F. Supp. 2d 635, 641 (S.D. Miss. 2007) ("[R]egardless

of whether the officer had authority under state law to make the arrest, the arrest is valid under constitutional principles so long as the officer had probable cause to arrest.").  Officer Williams's purported lack of jurisdiction therefore cannot serve to taint the probable cause determinations.

Finally, Welsh contends that Officer Williams omitted facts that could have supported a finding that Defendant Chavez and the other MTC guards "were the first aggressors," including that security personnel sprayed Welsh with a chemical agent, Welsh "claimed to raise [his] hands in surrender," and Chavez "punched [Welsh] in the stomach and genital area."  Questionnaire 10, 15.  To the extent Welsh believes these facts could have supported his claim of self-defense, he cannot establish a *Franks* violation under these circumstances.

"The Fifth Circuit has expressly declined to address whether evidence of an affirmative defense, such as self-defense, is relevant to a determination of probable cause."  *Thompson v. Hammond City*, No. 18-10658-WBV-JVM, 2019 WL 7291060, at *8 (E.D. La. Dec. 30, 2019), *aff'd*, 2023 WL 155412 (5th Cir. Jan. 11, 2023); *see Loftin v. City of Prentiss*, 33 F.4th 774, 780 n.2 (5th Cir. 2022) ("This court has repeatedly refused to opine on whether 'facts supporting the existence of an affirmative defense are relevant to the determination of probable cause.'" (citations omitted)).  "All other circuits to consider the issue appear to have held that evidence of an affirmative defense is relevant to the probable cause inquiry in *some circumstances*."  *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 835 (S.D. Tex. 2011) (emphasis added) (citing cases).  This comports with Fifth Circuit precedent "that while law enforcement personnel 'may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'"  *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)).  The court has also advised, however, that "probable cause is not destroyed by a suspect's denial."  *Glenn*, 242 F.3d at 313 n.3.

It is also well settled that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588.  District courts in this circuit have therefore reasoned that an "officer may not ignore conclusively established evidence of the existence of an affirmative defense, but the officer has no duty to investigate the validity of any defense." *Mabry v. Lee Cnty.*, 100 F. Supp. 3d 568, 573–74 (N.D. Miss. 2015) (citation omitted); *accord Thomas*, 800 F. Supp. 2d at 836 ("[I]f the arresting officer knows of facts that conclusively establish that an affirmative defense applies, it cannot accurately be said that the officer has probable cause that the suspect committed the offense.").

Welsh's allegations, confirmed by the video footage, paint the picture of an escalating resident compliance issue in which Welsh repeatedly defied orders, resisted and/or blocked chemical agents, and continued to fight against physical restraints once security personnel entered his room.  Moreover, Welsh orally and in writing confirmed to Officer Williams that he removed Chavez's helmet.  Although Welsh points to information that may have supported his self-defense claim at trial, the defense is speculative at best because it is based on an unproven legal theory— i.e., that Welsh was justified in resisting because MTC security personnel used chemical agents in a manner inconsistent with contract provisions or internal policies and procedures, despite his repeated non-compliance.  Requiring Officer Williams to negate or present this "affirmative defense" in a probable cause affidavit would create a dangerous precedent and impose upon law enforcement an almost impossible burden to investigate and research legally questionable theories justifying an individual's apparent criminal behavior, absent the presence of facts that *conclusively* establish a known affirmative defense.[15]  *See Mabry*, 100 F. Supp. 3d at 573–74; *Thomas*, 800 F. Supp. 2d at 836.

---

[15] Welsh generally averred to Officer Williams that he had the right to self-defense.  *See* Compl. 13 (alleging he told the officers he had "a right to defend himself from attack").  Even assuming he also communicated to Williams his

Thus, Welsh pleads no facts to defeat probable cause because Welsh's defense was not conclusively established. *See Loftin v. City of Prentiss*, 539 F. Supp. 3d 617, 627–28 (S.D. Miss. 2021) (rejecting *Franks* claim where "the affidavit would still establish probable cause to arrest [p]laintiff for aggravated assault" if it included "that [p]laintiff claimed to have acted in self-defense" because it was "undisputed that [p]laintiff admitted that he shot [the victim], that bystanders identified [p]laintiff as the shooter," and officers "have no duty to investigate the validity of any defense" (citations omitted)), *aff'd*, 33 F.4th 774 (5th Cir. 2022); *Turner v. Criswell*, No. 4:19-CV-00226-ALM-CAN, 2020 WL 1901086, at *6–7 (E.D. Tex. Jan. 6, 2020) (rejecting argument that a "warrant application was deficient because [the officer] did not include the corroborating statements supporting [p]laintiff's affirmative defense" where "the totality of facts and circumstances available to [the officer] at the time of the incident did not conclusively establish the affirmative defense of self-defense"), *R. & R. adopted by* 2020 WL 613963 (E.D. Tex. Feb. 10, 2020); *Thompson*, 2019 WL 7291060, at *8 ("Because Plaintiff has provided no evidence from which the [c]ourt can ascertain that [the officers] . . . faced 'conclusively established evidence' at the time of the arrest . . . the [c]ourt declines to find that the officers lacked probable cause . . . ."); *cf. Lewis*, 2017 WL 3928117, at *3 ("A mere assertion of an affirmative defense does not negate probable cause. Only conclusively established facts may negate probable cause."); *Johnson v. Crook*, No. W-11-CA-00212, 2012 WL 12871138, at *5 (W.D. Tex. Mar. 21, 2012) ("If the officer knows of facts conclusively establishing a defense, he does not have probable cause to believe that the suspect committed a crime . . . .").

---

theory that security's conduct violated a contract or institutional policy, thus justifying his resistance, such information falls far short of conclusively establishing an affirmative defense. Williams simply needed some basis to reasonably believe that Welsh, *inter alia*, (1) was committed to the facility and (2) assaulted "a person who contracts with the state to perform a service in a civil commitment facility or an employee of that person" (i) "while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by the state to provide the service." TEX. PENAL CODE § 22.01(b-1)(1)–(2).

In sum, Welsh has presented many arguments in support of his claim that Officer Williams tainted the magistrate's and grand jury's probable cause determinations. Those arguments are unavailing because he largely seeks to establish that he is not *guilty* of the charged offense. To be sure, one or more of these arguments may well have provided reasonable doubt sufficient to prevent a conviction if Welsh had proceeded to trial. But for the purpose of his proceedings before this Court, it matters not whether Welsh is actually guilty of the charged offense. *See United States v. Williams*, 504 U.S. 36, 51 (1992) ("It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge."). Rather, the operative question is whether Officer Williams tainted the intermediaries' probable cause determinations by (1) failing to "provide any supporting facts from which [an intermediary] could independently determine probable cause," *Blake v. Lambert*, 921 F.3d 215, 220 (5th Cir. 2019), or (2) intentionally or recklessly including untrue or excluding true material facts. *See Kohler*, 470 F.3d at 1113; *Winfrey*, 901 F.3d at 494. This does not describe Welsh's allegations. He therefore has not pleaded facts to overcome the independent-intermediary doctrine, and his Fourth Amendment claim should be dismissed.

### E. Welsh's allegations do not satisfy the elements required to raise a viable malicious prosecution claim under federal law.

Welsh brings a Fourth Amendment "unreasonable seizure" claim against Defendants Chavez and Schmoker for their involvement in his arrest. Compl. 30. Welsh's assertions in support of this claim are the same as those he advances as to his state law malicious prosecution claim. *See id.*; Questionnaire 23–24. He contends Defendants violated his rights by (1) "claiming he assaulted Chavez while he acted . . . under the scope of the contract" and (2) "alleging he scratched Chavez, though he stated it was an accidental or involuntary act by Welsh and [Chavez] made-up an elaborate story about pinning Welsh against the wall then putting down the shield as

Welsh removed his gasmask and helmet to scratch[ ] at his face." Compl. 30. Welsh avers that Defendants "knew these statements would get [him] criminally prosecuted when they lied." Questionnaire 23.

The Court's research has revealed no authority to support extending Fourth Amendment liability for reporting a suspected crime in these circumstances. *Cf. Hughes v. Meyer*, 880 F.2d 967, 971–72 (7th Cir. 1989) (rejecting claim that law enforcement officer violated plaintiff's "[F]ourth [A]mendment right to freedom from unreasonable seizure by providing [police officers] . . . with false information" because defendant's "acts of describing his encounter . . . was functionally equivalent to that of any private citizen reporting to the police the details of an alleged criminal act" and the defendant therefore "did not act under color of state law" in doing so); *Mims v. Oliver*, No. H-15-644, 2017 WL 3034032, at *17–18 (S.D. Tex. July 18, 2017) (concluding professor "was not acting under color of state law when he filed the criminal charges against [plaintiffs]" because "he was acting in his capacity as a private citizen reporting a crime" and there were "no facts showing that he used or misused his authority as a professor in making the report to the police"), *R. & R. adopted by* 2017 WL 3575706 (S.D. Tex. Aug. 17, 2017). As such, and because Welsh's allegations mirror those concerning his malicious prosecution claim under Texas state law, the Court construes this Fourth Amendment claim as one for malicious prosecution in accordance with § 1983.

"[T]he elements of the state-law tort of malicious prosecution and the elements of the constitutional tort of 'Fourth Amendment malicious prosecution' are coextensive." *Armstrong*, 60 F.4th at 279 (citation omitted). To prevail on a constitutional malicious prosecution claim, a plaintiff must establish the following: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff . . . ; (3) its

bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Id.* (citation omitted). "[S]tate actors other than prosecutors may be liable for damages for bad faith prosecution, if they join in malicious prosecution by prosecutors, or if their malice results in an improperly motivated prosecution without probable cause." *Hand*, 838 F.2d at 1426.

Welsh has not raised a viable malicious prosecution claim based on his belief that Defendants Schmoker and Chavez reported to Officer Williams that Welsh assaulted Chavez while he was acting within the scope of the contract. To begin, Welsh admits that he is unaware whether Defendants even made such a claim. *See* Questionnaire 20 (explaining that he "inferred" it because he was later criminally charged). More significantly, Welsh again conflates factual allegations (i.e., who, what, when) with conclusions of law (i.e., legal consequences of those facts). Welsh concedes that Defendant Chavez was part of the MTC security team at the time of the alleged assault and that he entered Welsh's room pursuant to his supervisor's orders. *See* Questionnaire 3 (alleging that Defendant Schmoker "order[ed] a five man team to use force against [Welsh]"). There is no basis to find Defendants liable for generally relaying those facts to authorities, even if Welsh disagrees with the subsequent legal charging decisions others made based on those facts. *See Lewis v. Cont'l Airlines, Inc.*, 80 F. Supp. 2d 686, 700 (S.D. Tex. 1999) ("It is well established that merely reporting facts to the proper authorities does not support a claim of malicious prosecution.").

Neither can Welsh proceed on a claim based on his disagreement with Defendants' version of events, even if Welsh's recitation is more accurate. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1269 (5th Cir. 1991) ("One may not recover in an action for malicious prosecution because the opposing party was mistaken about the strength of a claim." (citation omitted)). Welsh

first challenges Chavez's "claim that he had [Welsh] pinned against the wall" (Questionnaire 24), but as discussed above, the video shows the five-man security team surrounded Welsh as he retreated toward the back wall of his room, and Welsh does not dispute removing the helmet. *Supra* Section III.D.2.  Second, Welsh alleges Defendants should not have reported the incident because "it was an accidental or involuntary act by Welsh."  Compl. 30.  Welsh's assertion is unavailing.  *See Johnson v. Wal-Mart Stores, Inc.*, 217 F. Supp. 2d 762, 767 (E.D. Tex. 2002) ("[D]espite protests from the plaintiff that the incident may have been a mistake, in malicious prosecution cases, the complainant's failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed.").  Welsh also contends that Defendants Schmoker and Chavez "lied about [Welsh] scratching Chavez" because "Chavez hurt himself when he fell." Questionnaire 22–23.  In other words, Welsh disputes the *cause* of Chavez's injury but does not deny removing Chavez's helmet mere seconds after Chavez stumbled.  *See* Compl. 10.  And beyond his conclusory assertions, Welsh pleads no facts to support a plausible inference that Defendants *knew* Chavez's face was scratched when he stumbled as opposed to when Welsh forcibly removed his helmet.  To the contrary, Welsh contends that proof of their knowledge "is captured on Williams['s] BWC in Schmoker's office" (*id.*), but the bodycam footage contradicts his claim.[16]

---

[16] Welsh understandably does not direct the Court to a particular portion of the video.  Even so, the Court viewed all 2 hours and 28 minutes of Officer Williams's bodycam footage, as well as 1 hour and 28 minutes of the dashcam and car footage.  The video captured a brief conversation between Officer Williams and Defendant Chavez in Defendant Schmoker's office, during which Williams asked Chavez and Schmoker questions about the incident.  BWC 1 2:16–6:40, 9:24–11:26.  Chavez described the alleged assault as follows:

> When we entered, I tripped over like a container that he had on the floor.  So, I tripped, I was on my knees, I had him up against the wall with the shield.  But I had him, afterwards when I let go of the shield, I had him on the wall, but he was holding onto my helmet and my vest.  So, I tried to—I was pushing him away, and as I was pushing his arms away, he ripped off my helmet and my mask and

In short, Welsh pleads no facts to show Defendants lacked probable cause to report a crime. *See Cameron v. Christian*, No. SA–06–CA–325–FB, 2008 WL 11408705, at *10 n.149 (W.D. Tex. Mar. 12, 2008) ("The question is not what the actual facts were, but what the prosecuting party honestly and reasonably believed the facts to be." (citation omitted)), *R. & R. adopted by* 2008 WL 11408755 (W.D. Tex. May 28, 2008). Nor do Welsh's allegations undermine the magistrate's and grand jury's probable cause determinations. *See Walker v. Harris*, No. 3:96–CV– 3129–G, 2000 WL 1310530, at *3 (N.D. Tex. Sept. 13, 2000) ("The fact that [plaintiff] was indicted by a grand jury is also fatal to his claim for malicious prosecution which, like false arrest, requires an absence of probable cause."); *Casanova v. City of Brookshire*, 119 F. Supp. 2d 639, 654 (S.D. Tex. 2000) ("In the absence of evidence that material facts were withheld or that the deliberations of the grand jury or other intermediary were otherwise tainted by the actions of the defendant, however, no liability for malicious prosecution can attach."). Moreover, there is no basis to conclude that Defendants *knew* they lacked probable cause and maliciously reported the incident anyway. *See Schill v. Transwestern Publ'g Co.*, No. SA-06-CA-0655-FB, 2008 WL 11411843, at *2 (W.D. Tex. Dec. 8, 2008) ("[I]n malicious prosecution actions, courts presume that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings."), *R. & R. adopted by* 2009 WL 10701001 (W.D. Tex. Mar. 31, 2009). Accordingly, this claim should be dismissed.

---

then scratched me. And I could feel like the blood coming down, which I had some blood coming down, and caused a big—I mean it hurt for a little while, but you know I can still feel it.

BWC 1 2:16–:54. Later, while photographing Chavez's facial injury, the following exchange took place:

| | |
|---|---|
| Officer Williams: | Do you have any other injuries? |
| Defendant Chavez: | Uh just— |
| Officer Williams: | —Arms scraped up knees, anything like that? |
| Defendant Chavez: | Just when I hit that little container on the floor. |

BWC 1 9:57–10:06. In other words, Chavez attributed *other injuries* to the fall, but he in no way expressed any belief that it also caused the facial injury.

**F. Welsh has not pleaded viable claims based on Defendants' non-prosecution and discriminatory failure to protect.**

Welsh brings several versions of the same general claim under the Fourteenth Amendment—i.e., TCCC personnel should have been and/or should be arrested and prosecuted for assaulting him. *See* Compl. 32–34 (characterizing claims as failure to protect, equal protection, and selective enforcement). Welsh primarily advances this argument in support of his claims against Officer Williams, Officer Doe, Sheriff Maddox, ADA Redman, DA Say, the City, and the County concerning the September 15, 2020 incident. *Id.*; *see* Questionnaire 34–35, 38, 40–41, 43, 45–47, 49, 52–53. Welsh also discusses several other alleged assaults that he believes should have resulted in criminal charges against TCCC personnel, although he provides little factual detail as to these incidents. *See* Questionnaire 45–53. Those alleged assaults occurred on the following dates: (1) January 22, 2016; (2) March 20–21, 2017; (3) November 13, 2017; (4) March 4, 2022; (5) May 31, 2022; and (6) May 31–October 1, 2022. *Id.*

*1. Statute of Limitations*

To the extent Welsh intends to bring claims concerning alleged assaults in January 2016, March 2017, and November 2017, they are time-barred.

"The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (citation omitted); *see, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 387 (2007) ("The length of the statutes of limitations for § 1983 claims is that which the State provides for personal-injury torts." (cleaned up)). In Texas, the applicable limitations period for a personal injury claim is two years. *See* Tex. Civ. Prac. & Rem. Code § 16.003(a). Accrual of limitations, on the other hand, "is a question of federal law." *Wallace*, 549 U.S. at 388. "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and

present cause of action, that is, when the plaintiff can file suit and obtain relief." *Id.* (alterations, quotation marks, and citations omitted); *Hoffman v. Hous. Soc'y for the Prevention of Cruelty to Animals* (*In re Hoffman*), 955 F.3d 440, 444 (5th Cir. 2020) (per curiam) ("[T]he limitations period begins to run once the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." (internal quotation marks and citation omitted)). "A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support a claim." *Piotrowski*, 237 F.3d at 576.

Welsh initiated this suit on July 13, 2022.  ECF No. 1.  Although Welsh provides few facts concerning the January 2016, March 2017, and November 2017 assaults, his pleadings make clear that any claim based on these incidents accrued well before July 2020.  According to Welsh, he reported each event to LPD.  Questionnaire 39.  Similarly, he contends DA Say and ADA Redman learned of each event in connection with criminal case no. DCR 5715-18, which involved the November 2017 incident.  *Id.* at 41–42; *see* Compl. 16–17.  The trial in that action concluded in 2018, and the conviction was reversed in February 2019.  *See* Compl. 17 (citing *Welsh v. State*, 570 S.W.3d 963, 964 (Tex. App.—Amarillo 2019, pet. ref'd)).  Accordingly, any claim based on these events is untimely.

### 2. *Standing to Challenge Failure to Prosecute Non-Time-Barred Claims*

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). "Supreme Court precedent makes clear that a citizen does not have standing to challenge the policies of the prosecuting authority unless she herself is prosecuted or threatened with prosecution." *Lefebure v. D'Aquilla*, 15 F.4th 650, 652 (5th Cir. 2021) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–19 (1973)), *cert. denied*, 142 S. Ct. 2732 (2022).  This well-established standing requirement "reinforces th[e] constitutional allocation of power among the

branches of government" because "it is not the province of the judiciary to dictate prosecutorial or investigative decisions to the executive branch." *Id.* at 654–55. Based on these principles, the Fifth Circuit has recognized that "crime victims have standing to sue when the police refuse to provide them with physical protection," but they lack standing to challenge "prosecutorial inaction." *Id.* at 658. In other words, parties may sue concerning "the failure of police to protect the plaintiff from future crime," but not based on "the failure of prosecutors to put a third party in jail for past crime." *Id.* at 659. This is true even though "the denial of prosecution may very well be tantamount to a denial of protection" because "the Supreme Court made clear in *Linda R.S.* that any connection between a non-prosecution policy and subsequent criminal activity is too 'speculative' to support standing." *Id.* at 659–60 ("*Linda R.S.* is based on the premise that 'a victim of an undeterred crime is *not automatically* a victim of nonenforcement.'" (citation omitted)).

"Plaintiffs always have the burden to establish standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Where a plaintiff does not prove standing, the Court lacks subject matter jurisdiction and thus cannot reach the merits of the claims. *Id.*; *see Reyes v. N. Tex. Tollway Auth.*, 830 F. Supp. 2d 194, 201 (N.D. Tex. 2011) ("Lack of standing is a defect in subject matter jurisdiction."). "If the court finds that it lacks subject matter jurisdiction, it has a duty to dismiss the case." *McDonald v. Asvestas*, No. 3:97–CV–0120–G, 1997 WL 74711, at *1 (N.D. Tex. Feb. 12, 1997); *see* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). And "the proper course is to dismiss . . . without prejudice." *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 191 n.4 (5th Cir. 2023).

Here, Welsh challenges ADA Redman and DA Say's decision to not prosecute his alleged assailants—he does not challenge Defendants' policies as to a prosecution directed at Welsh.

"[E]ach of us has a legal interest in how *we* are treated by law enforcement—but not a legally cognizable interest in how *others* are treated by law enforcement. . . . [V]ictims do not have standing based on whether *other* people—including their perpetrators—are investigated or prosecuted." *Lefebure*, 15 F.4th at 652. Because binding precedent instructs that Welsh lacks standing to challenge policies of the prosecuting authority unless they relate to his prosecution or threatened prosecution, Welsh has failed to establish standing to challenge Defendants' non-prosecution of the alleged assaults occurring on March 2022, May 2022, and May–October 2022. *See id.* Any claims based on the non-prosecution of these incidents should therefore be dismissed for lack of subject matter jurisdiction.[17]

### 3. Non-Prosecution and Discriminatory Police Protection Claims

Welsh raises claims against ADA Redman, DA Say, and the County because he believes they denied him equal protection and selectively enforced TEX. PENAL CODE § 22.01 against him. Compl. 32–33. Similarly, Welsh believes Officer Williams, Officer Doe, and Sheriff Maddox failed to protect him and violated his right to equal protection through their discriminatory police conduct. *Id.* at 32–34.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir.

---

[17] The same is true for Welsh's claims concerning Defendants' non-prosecution of the January 2016 and March 2017 incidents. The Court would therefore recommend dismissal of these claims even if they were not otherwise barred.

1992) (per curiam).  To establish a violation of his right to equal protection, a plaintiff "must either allege that (a) 'a state actor intentionally discriminated against [him] because of membership in a protected class[,]' or (b) he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  *Gibson v. Tex. Dep't of Ins.— Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (internal citations omitted); *see also Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (per curiam).

The Fifth Circuit also recognizes a "selective prosecution" claim, which stems from the Fourteenth Amendment right to equal protection.  *Shipman*, 766 F. App'x at 26; *Wayte v. United States*, 470 U.S. 598, 608 (1985) ("It is appropriate to judge selective prosecution claims according to ordinary equal protection standards.").  "A court's consideration of an Equal Protection-based claim of selective prosecution necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors."  *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005) (per curiam).  To overcome this presumption, a plaintiff "must first make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not."  *United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983). Second, the plaintiff "must then demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."  *Id.* This second prong is crucial to a selective prosecution claim because "the mere exercise of some selectivity by the government in instituting prosecutions is not itself a constitutional violation." *Id.*  Indeed, "the decision to prosecute one person rather than another is one left to executive discretion" (*id.* at 1235), and it is therefore "not enough to claim that someone equally guilty of a

crime should have been prosecuted." *Williams v. Garland Police Dep't*, No. 3:13–cv–2880–M, 2013 WL 5502808, at *3 (N.D. Tex. Oct. 3, 2013).

Finally, the Supreme Court has noted that a "State may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989). The Fifth Circuit has also examined discriminatory police conduct under a class-of-one theory. *See Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000) ("Although no general constitutional right to police protection exists, the state may not discriminate in providing such protection."), *overruled on other grounds by McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002). Under the latter theory, a plaintiff "must show: (1) that he was intentionally treated differently from others similarly situated; (2) that illegitimate animus or ill will motivated the disparity; and (3) that there was no rational basis for the difference in treatment." *Wyatt v. Matagorda Cnty.*, No. 3:13-CV-356, 2017 WL 908202, at *6 (S.D. Tex. Mar. 7, 2017); *see Mata v. City of Kingsville*, 275 F. App'x 412, 415 (5th Cir. 2008) (per curiam).

In Welsh's view, ADA Redman and DA Say engaged in "selective enforcement" and denied him "equal protection of the state criminal protective services" because he was prosecuted for assaulting an MTC security officer in connection with the September 2020 event, but no MTC staff member has been prosecuted for assaulting him based on their conduct during the same incident. *See* Compl. 33–34 (raising claim because Defendants "selectively enforc[ed] the Texas Penal Code 22.01"); Questionnaire 45–47. Similarly, Welsh's claim against Williams and Doe rests on their failure to criminally charge MTC personnel in connection with the September 2020 incident, and his complaint against Sheriff Maddox relies on Maddox's failure to (1) investigate the September 2020 and March 2022 events and (2) secure criminal charges after his investigation

of the May 2022 and May–October 2022 incidents.  Compl. 33–34; Questionnaire 35–53.  These facts do not give rise to an equal protection claim.

To begin, Welsh's claims rest in part on his assertion that he "is a member of the Sexually Violent Predator Class."  Compl. 33.  "Persons designated as sexually violent predators are not a protected class" for equal protection purposes.  *Grohs v. Fratalone*, No. 13–7870 (KM) (MAIl), 2015 WL 6122147, at *5 (D.N.J. Oct. 16, 2015); *see also Allen v. Mayberg*, No. 1:06–cv–01801–BLW–LMB, 2013 WL 3992016, at *7 (E.D. Cal. Aug. 1, 2013) (stating that "SVPs are not a suspect or quasi-suspect class for Equal Protection purposes"); *Hawkins v. Ahlin*, ED CV 12–626–R (PJW), 2013 WL 3475187, at *6 n.7 (C.D. Cal. July 10, 2013) (noting the law does not support a finding that civilly committed SVPs qualify for protection as a protected class).  Neither are sex offenders a suspect class.  *See Kerr v. Davis*, 855 F. App'x 968, 969 (5th Cir. 2021) (per curiam) (recognizing that "sex offenders are not a suspect class for equal protection purposes"), *cert. denied*, 142 S. Ct. 1151 (2022); *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 758 (E.D. Tex. 2015) ("[S]ex offenders and/or persons included on the Texas sex offender registry are not a suspect class."), *aff'd*, 858 F.3d 348 (5th Cir. 2017).  Any claim based on this theory therefore lacks merit.

Welsh's class-of-one claims against ADA Redman and DA Say fare no better.  *See Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016) ("A class-of-one equal-protection claim lies 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000))); *Stein v. Dallas Cnty.*, No. 3:22-CV-1255-D, 2023 WL 2700720, at *4 n.6 (N.D. Tex. Mar. 29, 2023) ("The selective enforcement claim exists as a category under the broad umbrella of the 'class of one'

claims." (citation omitted)). Welsh claims he is similarly situated to MTC guards because "[e]veryone in the State of Texas [is] similar under the penal statute without exceptions." Compl. 21; Questionnaire 51. This is not a correct statement of the law. "Similarly situated means in all relevant respects alike." *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 978 (5th Cir. 2022) (internal quotation marks and citation omitted). In other words, "[i]ndividuals are similarly-situated when 'circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'" *Jackson v. City of Hearne*, No. W-18-CV-00015-ADA, 2019 WL 13301706, at *5 (W.D. Tex. June 17, 2019) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)), *aff'd*, 959 F.3d 194 (5th Cir. 2020). As a civilly committed person, Welsh is not similarly situated to personnel employed at the TCCC.[18] *See Wagner v. Harpstead*, No. 18-cv-3429 (MJD/HB), 2019 WL 6918360, at *5 (D. Minn. Nov. 12, 2019) (concluding civilly committed SVP was "not similarly situated to members of the general public"), *R. & R. adopted by* 2019 WL 6910138 (D. Minn. Dec. 19, 2019); *cf. Smith v. Corcoran*, No. 02-40921, 2003 WL 1111849, at *1 (5th Cir. Feb. 19, 2003) (concluding "non-prisoners and prisoners are not similarly situated" (internal quotation marks and citation omitted)); *Ashley v. Caldwell*, No. 3:15–cv–1799, 2015 WL 6441281, at *1–2 (W.D. La. Sept. 21, 2015) (recommending dismissal of prisoner's equal protection claim based on allegation that he was similarly situated to prison guards), *R. & R. adopted by* 2015 WL 6441048 (W.D. La. Oct. 21, 2015).

---

[18] To the extent Welsh compares his treatment to that of others at the TCCC, he has failed to plead facts supporting an equal protection claim against Say and Redman. That is, Welsh suggests that TCCC personnel do not subject other SVPs to chemical or mechanical restraints—i.e., the primary basis for his assault allegations. *See* Compl. 33 (positing that he is similarly situated to others "in a residential facility who are provide[d] protection from the use of restraints"); Questionnaire 51 ("I am similarly situated with others under the Texas Health and Safety Code 841.0838[,] [w]hich would presumably protect other Sexually Violent Predators under the statute."). While this fact may be relevant to an equal protection claim against TCCC personnel, it in no way speaks to DA Say's or ADA Redman's unequal treatment in their prosecution of Welsh.

Neither can Welsh succeed under a class-of-one theory against Officer Williams, Officer Doe, and Sheriff Maddox based on their alleged discriminatory failure to protect.  As an initial matter, Welsh pleads no facts to support such a claim as to Williams and Doe beyond their alleged refusal to criminally charge the MTC guards in connection with the September 2020 assault, e.g., that he was treated differently than others similarly situated and that illegitimate animus motivated the disparity.  *See* Questionnaire 52.  As to Sheriff Maddox, Welsh contends that Sheriff Maddox personally investigated other SVPs' claims of assaults in July 2021, but "he refused to provide the State protective services for Welsh."  Questionnaire 48.  His other allegations, however, undermine this claim.

According to Welsh, Sheriff Maddox sent a deputy to investigate Welsh's May 2022 assault claim and the May–October 2022 allegations.[19]  *Id.* at 48–49.  The deputy "forwarded these claims to [the DA] who . . . refused to bring the criminal charges."  *Id.* at 49.  Moreover, Welsh contends that Sheriff Maddox, together with the DA's Office, told Defendant Schmoker "that they will not press charges on any MTC employee for the assaultive conduct on September 15, 2020, May 31, 2022, or the constant restraints . . . from May 31, 2022 to October 1, 2022" because "they decided that they [sic] law does not allow enough flexibility to enforce MTC policy and that they will not enforce the rights as considered under the scope of the contract or the Texas Health and Safety Code 841.0838."  *Id.*  In other words, Sheriff Maddox (or his deputies) investigated Welsh's claims and referred them to the prosecuting attorney who apparently concluded that MTC personnel did not violate the Texas Penal Code.  Moreover, Welsh explains that a sheriff's deputy came to the same conclusion concerning substantially similar criminal allegations by another SVP.

---

[19] As to the first incident, Welsh claims he was "assaulted by the use of chemical agents by center security based only o[n] the threat of Welsh throwing water on the staff."  Compl. 23.  He then characterizes the "use of mechanical restraints . . . on a daily basis" between May and October 2022 as the second assault.  Questionnaire 49.

*Id.* at 50.  As such, Welsh's allegations fail to support *any* element of his class-of-one equal protection claim against Williams, Doe, or Maddox—i.e., disparate treatment, discriminatory motive, or a lack of rational basis for any difference in treatment.  *See Mata*, 275 F. App'x at 415; *Wyatt*, 2017 WL 908202, at *6.

In sum, the district judge should dismiss Welsh's equal protection claims because they lack an arguable basis in law.  *See Welsh*, 845 F. App'x at 320 ("The Equal Protection Clause keeps governmental decision makers from treating differently persons who are in all relevant respects alike. That does not describe Welsh's allegations; Welsh simply asserts that he was denied his rights when criminal charges were not brought against those who assaulted him." (citation and internal quotation marks omitted)); *Jackson v. City of Hearne*, 959 F.3d 194, 201–02 (5th Cir. 2020) (rejecting selective prosecution claim because appellant did "not plead disparate treatment among similarly situated persons"); *Bryan v. City of Dallas*, 188 F. Supp. 3d 611, 620 (N.D. Tex. 2016) (dismissing police protection claim because plaintiffs' allegations were "far too sparse" and required "logical leaps"); *Brown v. Allen*, No. 3:16-cv-214-N-BN, 2016 WL 2855581, at *3–4 (N.D. Tex. Apr. 25, 2016) (recommending dismissal of equal protection claim based on police department's "refus[al] to investigate or file criminal charges" where plaintiff failed to allege membership in a protected class), *R. & R. adopted by* 2016 WL 2827038 (N.D. Tex. May 13, 2016).

### G.  Welsh's pleadings do not support a viable conspiracy claim under §§ 1983, 1985(2)–(3), or 1986.

Welsh raises conspiracy claims under the Fourteenth Amendment, 42 U.S.C. § 1985(2)–(3), and § 1986.  Compl. 34–35.  According to Welsh, Sheriff Maddox, DA Say, ADA Redman, Chief Hester, Officer Williams, Officer Doe, and Administrator Schmoker (and therefore the

County, the City, and MTC) conspired to deny him the right to equal protection.[20]  *Id.*  Welsh believes Defendants entered into an agreement to conspire during Schmoker's conversation with DA Say and ADA Redman before Schmoker called the police about Welsh's alleged assault against Chavez on September 15, 2020.  Questionnaire 59.

### 1. Section 1983

"To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred."  *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019) (per curiam).  "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983."  *Id.*; *accord Young v. Biggers*, 938 F.2d 565, 569 (5th Cir. 1991) ("Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient."); *Chadman v. Quisenberry*, No. 4:17-CV-700-Y, 2019 WL 3530422, at *6 (N.D. Tex. Aug. 2, 2019) ("Conspiracy claims under § 1983 require that the claimant relate specific facts.").  "Therefore, to establish his conspiracy claim, [Welsh] must plead specific, nonconclusory facts that establish that there was an agreement among the defendants to violate his federal civil rights."  *Montgomery*, 759 F. App'x at 314.  Indeed, "[Welsh's] facts, when placed in a context must raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent

---

[20] Welsh appears to also invoke the Privileges and Immunities Clause.  *See* Compl. 35 (alleging Defendants conspired "with intent to deny to Welsh the equal protection of the laws . . . or of equal privileges and immunities under the laws").  The Privileges and Immunities Clause, however, "is inapt because it 'prevents a state from discriminating against citizens of another state in favor of its own citizens,' and Welsh does not allege that he was treated differently than a citizen of another state."  *Welsh*, 845 F. App'x at 320.

action." *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) (alterations, internal quotation marks, and citation omitted).

To begin, Welsh cannot maintain a claim based on Defendants' conspiracy to deprive him of his equal protection rights where he has not raised a viable equal protection claim. *See Buehler*, 27 F.4th at 989 (explaining that plaintiff's conspiracy claim failed given that plaintiff must "point to an underlying violation of his or her constitutional rights"); *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) ("No [constitutional] deprivation, no § 1983 conspiracy."); *Hale*, 45 F.3d at 920 ("[A] conspiracy claim is not actionable without an actual violation of section 1983."); *Moore v. City of Dallas*, No. 3:22-cv-0714-M-BT, 2023 WL 2589394, at *18 (N.D. Tex. Mar. 17, 2023) ("[Plaintiff's] conspiracy claims must be dismissed because he has not plausibly pleaded an underlying constitutional deprivation by the Defendants."); *Thomas v. State*, 294 F. Supp. 3d 576, 610 (N.D. Tex. 2018) ("Section 1983 does not provide a cause of action for conspiracy to deny civil rights unless there is an actual violation of civil rights."), *R. & R. adopted by* 2018 WL 1254926 (N.D. Tex. Mar. 12, 2018). Any conspiracy claim therefore must be dismissed for this reason alone.

Moreover, Welsh's allegation concerning Defendant Schmoker's conversation with Say and Redman is insufficient to establish personal involvement as to Maddox, Hester, Williams, or Doe in any agreement to conspire. Any conspiracy claim against these parties should therefore be dismissed for this additional reason. *See Jabary*, 547 F. App'x at 610; *Reagan v. Burns*, No. 3:16-CV-2590-G-BH, 2019 WL 6733023, at *19 (N.D. Tex. Oct. 30, 2019) ("Plaintiff's conclusory allegations of an agreement, without any facts tending to show an agreement, are insufficient to state a viable conspiracy claim."), *R. & R. adopted by* 2019 WL 6729085 (N.D. Tex. Dec. 10, 2019); *Chadman*, 2019 WL 3530422, at *6 (dismissing conspiracy claim because plaintiff "set[]

forth absolutely no facts of any particular interaction between named defendants related to any agreement with each other to violate [his] rights"); *McCall v. Peters*, No. 300CV2247–D, 2001 WL 1082417, at *5 (N.D. Tex. Aug. 28, 2001) (dismissing conspiracy claim against certain defendants where plaintiff "alleged no facts sufficient to suggest they were involved in any conspiracy"); *Bayou Fleet, Inc. v. Alexander*, 68 F. Supp. 2d 734, 745 (E.D. La. 1999) ("Individual liability under section 1983 must rest on facts reflecting the defendant's personal participation or involvement in the alleged wrong."), *aff'd*, 234 F.3d 852 (5th Cir. 2000).

Finally, as detailed below, Welsh's pleadings do not support conspiracy claims under § 1985(2)–(3) or § 1986 even if he had raised a viable conspiracy claim under § 1983.

### 2. Section 1985(3)

"Title 42 U.S.C. § 1985, part of the Civil Rights Act of 1871, creates a private civil remedy for three prohibited forms of conspiracy to interfere with civil rights under that section." *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 149 (5th Cir. 2010). Subsection (3) provides the following:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Under this statute, "[a] plaintiff must show membership in some group with inherited or immutable characteristics . . . or that the discrimination resulted from the plaintiff's political beliefs or associations." *Flander v. Kforce, Inc.*, 526 F. App'x 364, 369 (5th Cir. 2013)

(per curiam) (quoting *Galloway v. Louisiana*, 817 F.2d 1154, 1159 (5th Cir. 1987)). Welsh apparently contends that his status as an SVP is an "immutable characteristic" that triggers the protection of § 1985. *See* Compl. 35 ("[B]ecause Welsh belongs to the Sexually Violent Predator Class of individuals."). The Court disagrees.

Section 1985 generally addresses racial discrimination and has not been broadly construed to encompass other identifiable groups. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (providing that to establish a § 1985(3) claim, "a plaintiff must show, *inter alia* . . . that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action'" (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971))); *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 928 (5th Cir. 1977) (explaining that the Fifth Circuit has not explicitly decided whether § 1985 extends beyond racial animus); *Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 648, 668 (N.D. Miss. 2013) ("Section 1985 was enacted to address race-based animus and has rarely been extended further."). "A § 1985(3) class must possess a discrete, insular, and immutable characteristic, such as race, gender, religion, or national origin." *Jones*, 971 F. Supp. 2d at 668 (citing *Galloway*, 817 F.2d at 1159).

In *Bray v. Alexandria Women's Health Clinic*, the Supreme Court reasoned that a group opposing abortion did not qualify as a "class" under § 1985 because "the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." 506 U.S. at 269. Moreover, courts have held that prisoners are not a suspect class within the context of an equal protection claim. *See, e.g.*, *Phillips ex rel. Phillips v. Monroe Cnty.*, 311 F.3d 369, 376 n.2 (5th Cir. 2002); *see also City of Cleburne*, 473 U.S. at 442, 446 (holding that intellectually disabled persons are not a suspect or quasi-suspect class for purpose of equal protection review). Similarly, as set forth above, "[p]ersons designated

as sexually violent predators are not a protected class" for equal protection purposes. *Grohs*, 2015 WL 6122147, at *5.

Welsh has not cited, and the court has not found, any cases holding that SVPs constitute a protected class under § 1985. Based on the foregoing authority, the Court concludes that under § 1985, SVPs are more akin to prisoners or a group opposing certain political views, rather than a class defined by immutable characteristics. Accordingly, the Court concludes that Welsh's status as an SVP is not afforded protection by § 1985(3). *See Jones*, 971 F. Supp. 2d at 668–69 (concluding that plaintiff's status as a prisoner did not constitute an immutable characteristic). Consequently, Welsh cannot state a § 1985 claim.

   3.  *Section 1985(2)*

Section 1985 "[s]ubsection (2) concerns conspiracies directed at the right of participation in federal judicial proceedings." *Montoya*, 614 F.3d at 149; *see Mitchell v. Johnson*, No. 07-40996, 2008 WL 3244283, at *4 (5th Cir. Aug. 8, 2008) ("Our current understanding of § 1985(2) is that the statute seeks to ensure the fair adjudication of cases in federal court and provides a civil remedy where individuals conspire to exert untoward external pressure on parties or witnesses because of their participation in judicial proceedings."). It reads as follows:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2).

"The first clause of § 1985(2) prohibits conspiracies to deter witnesses from attending court or testifying, punish witnesses who have so attended or testified, or injure jurors." *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 687 n.6 (5th Cir. 2010). The second clause "prohibits conspiracies to deny any citizen equal protection of the laws or to injure a citizen for his efforts to ensure the rights of others to equal protection." *Id.* at 687. The Fifth Circuit has further recognized that the former "proscribes conspiracies that interfere with the administration of justice in federal court, and the second part proscribes conspiracies that interfere with the administration of justice in state court." *Daigle v. Gulf State Utils. Co., Loc. Union No. 2286*, 794 F.2d 974, 979 (5th Cir. 1986) (footnote omitted). Finally, the "race o[r] class-based animus requirement of § 1985(3) also applies to claims under the second part of § 1985(2)." *Id.*

Welsh contends that Defendants conspired against him "to learn a lesson and experience pay back for getting their [prior state criminal] conviction overturned" and because Welsh is an SVP. Compl. 35; Questionnaire 62. Thus, under either clause, § 1985(2) is inapplicable to Welsh's allegations. *See Ard v. Rushing*, 597 F. App'x 213, 221 (5th Cir. 2014) (per curiam) (reasoning that appellant's claim analyzed under the first clause "must fail" because she had "not contended that her right to participate in judicial proceedings ha[d] been impeded"); *Montoya*, 614 F.3d at 150 (finding § 1985(2) inapplicable where plaintiff's claim was "more analogous to a retaliatory discharge claim for the act of filing the lawsuit (in state court), which this section does not address"); *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998) (noting that plaintiffs failed "to show that the purported conspiracy was motivated by class-based animus" where the claim was based on the theory that the conspirators "desire[d] to get even"); *Daigle*, 794 F.2d at 979 (concluding appellant was "foreclosed from stating a claim under the second part of § 1985(2)" where he failed to "meet the class-based animus requirement"); *James v.*

*MedicalControl, Inc.*, 29 F. Supp. 2d 749, 755 (N.D. Tex. 1998) (finding allegations "insufficient to state a claim under [the first clause of] section 1985(2)" where plaintiff made no assertion that defendants "used force or intimidation to prevent him from attending or testifying in a federal court proceeding").

### 4. Section 1986

Welsh also seeks to impose liability under 42 U.S.C. § 1986. Section 1986 provides for recovery against anyone "who, having knowledge that [a § 1985 conspiracy] is about to be committed," does nothing about it. 42 U.S.C. § 1986. Because the Court has already determined that Welsh has not pleaded facts establishing a § 1985 conspiracy, Welsh cannot establish a claim under § 1986. *See, e.g.*, *Beckwith v. City of Houston*, 790 F. App'x 568, 576 (5th Cir. 2019) (per curiam) ("A § 1986 cause of action is dependent on a claimant's successful pleading of a § 1985 claim first."); *Bradt v. Smith*, 634 F.2d 796, 801 (5th Cir. Unit A Jan. 1981) ("[Section 1986] on its face requires the existence of a valid claim under s 1985."); *Mkt. v. Extended Stay Am.*, No. 3:15-CV-4065-G, 2016 WL 2914994, at *3 (N.D. Tex. May 19, 2016) ("In order to prevail under § 1986, a plaintiff must prove all the elements of § 1985(3) . . . .").

**H. Welsh fails to state a viable retaliation or harassment claim.**

Welsh believes Defendant Schmoker harassed and retaliated against him when he returned to the TCCC because he "defended himself against the criminal charge" and "refused to accept a plea offer." Compl. 37; Questionnaire 67. According to Welsh, Schmoker "used his power to refuse Welsh advancement in his therapy." Compl. 37. He explains that he "had previously completed the entire tier one treatment" and "was scheduled to be reviewed" for tier two advancement before the September 2020 incident. Questionnaire 67. Upon his return, "Schmoker instructed" the therapists that Welsh "must be punished for the incident" with Defendant Chavez, causing Welsh to "start . . . all over in therapy." *Id.* Schmoker allegedly "forced the results" in

violation of TCCO policy, which requires "the therapist conducting the intake review [to] assess the clients [sic] new treatment." *Id.* Welsh reported the violation, and TCCO Director Marsha McLane intervened and required "a proper evaluation based on [Welsh's] prior treatment," but Welsh contends Schmoker again "used his power and influence to dictate to the MTC employee clinical therapist not to recognize [Welsh's] prior treatment." *Id.* Welsh is "now required to do the tier one work over" again. *Id.*

### 1. Retaliation

A plaintiff must show the following to establish a retaliation claim: "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Conclusory allegations, including a plaintiff's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). Instead, "'[t]he [plaintiff] must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (per curiam) (quoting *Woods*, 60 F.3d at 1166); *see also Brown*, 911 F.3d at 245 (applying *Woods* to an SVP's retaliation claim).

Other than making the conclusory assertion that he believes Defendant Schmoker's actions were retaliatory, Welsh pleads no facts demonstrating causation. Causation requires a showing that "but for the retaliatory motive the complained of incident would not have occurred," *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (alteration and citation omitted), and Welsh fails to articulate facts supporting an inference that the TCCC therapists would have advanced Welsh from tier one to tier two *but for* his rejection of a plea deal and/or his defense in the criminal case.

First, Welsh has not alleged facts plausibly demonstrating that Schmoker retaliated for Welsh's defense of the criminal charge as opposed to simply disciplining Welsh for his repeated non-compliance during the September 2020 incident and/or harming a member of staff, presumably also in violation of TCCC policy. *See* Questionnaire 68 (discussing ordinary treatment of an SVP's "behavioral problems"). To the contrary, Welsh asserts that the intake therapists "indicated" that "Schmoker instructed . . . [he] must be punished for the incident" with Chavez. *Id.* at 67. This fact in no way supports—and even undermines—Welsh's contention that Schmoker sought to punish Welsh for defending himself in the criminal case or rejecting a plea deal. Welsh seemingly rejects this position based on an apparent belief that he cannot be punished under TCCC policy because the charge was dismissed in "the interest of justice." *Id.* Welsh is mistaken. The fact that the DA abandoned the "criminal charges in the matter does not mean that [Welsh] cannot be subject to discipline on the same facts." *Hudson v. Dretke*, No. 4:03–CV–943–Y, 2004 WL 575778, at *4 (N.D. Tex. Mar. 11, 2004); *cf. United States v. Shepard*, 78 F. App'x 387, 388 (5th Cir. 2003) (per curiam) (rejecting prisoner's arguments that (1) his criminal prosecution was barred by double jeopardy because he was charged in a prison disciplinary proceeding for the same conduct and (2) the government could not bring the charges because he was found not guilty in the prison disciplinary proceedings); *Guillory v. Neustrom*, No. 09–0244, 2009 WL 2406302, at *3 (W.D. La. Aug. 3, 2009) ("Pretrial detainees are not immune from prison disciplinary actions" even though the Fourteenth Amendment "prohibits the punishment of detainees prior to an adjudication of guilt." (citing cases)).

Moreover, Welsh's speculative and vague allegations do not sufficiently connect Schmoker's alleged retaliatory motive with the adverse act by TCCC therapists. Welsh merely contends that Defendant Schmoker initially violated an institutional policy and then, once the

violation was corrected, "used his power and influence to dictate to the . . . therapist not to recognize [Welsh's] prior treatment." Questionnaire 67. He claims "[t]his was *indicated . . .* during the intake review process" (*id.* (emphasis added)), but he does not otherwise offer supporting facts such as the specific statements giving rise to the inference. Thus, Welsh cannot present a timeline of facts from which the Court may draw an inference of causation. *See Emmett v. Hawthorn*, No. H–10–4034, 2010 WL 4394264, at *4 (S.D. Tex. Oct. 29, 2010) (dismissing retaliation claim because prisoner's allegations—concerning the warden's motive to retaliate and a subsequent fire in his room—did not "show that, but for some retaliatory motive, the complained of adverse act would not have occurred"); *Hines v. Graham*, 320 F. Supp. 2d 511, 521 (N.D. Tex. 2004) (finding prisoner failed to state a claim where, even after the court provided him an "opportunity to expound on his retaliation claims, [prisoner] offer[ed] only his own conclusory opinion that the Defendants had a retaliatory motive"); *see also Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) (affirming dismissal of civilly committed sex offender's retaliation claim where he did not "sufficiently allege[] any direct 'causal link' between [his therapist's actions] and his First Amendment protected activities").

Because Welsh has merely attached the "retaliation" label to actions performed by someone other than Defendant Schmoker, without adequate factual support, the Court recommends dismissal of Welsh's retaliation claim. *See, e.g.*, *McCoy v. Berrera*, No. 7:18-cv-00061-M-BP, 2020 WL 2025641, at *5 (N.D. Tex. Mar. 31, 2020) (concluding 12(b)(6) motion should be granted, where retaliation claim was "simply too conclusory and unsupported by factual allegations to support a plausible claim for relief"), *R. & R. adopted by* 2020 WL 1986460 (N.D. Tex. Apr. 27, 2020); *Coronado v. Lennox*, No. 5:12–CV–00044–BG, 2012 WL 7005384, at *2, *5 (N.D. Tex. Oct. 15, 2012) (recommending dismissal at screening of prisoner's retaliation claim

premised on nothing more than prisoner's personal belief that he was a victim of retaliation), *R. & R. adopted by* 2013 WL 440149 (N.D. Tex. Feb. 5, 2013); *Dotie v. Jones*, No. 2:10–CV–0128, 2010 WL 2668379, at *2 (N.D. Tex. June 16, 2010) (recommending dismissal of prisoner's retaliation claim because his conclusory allegations failed to satisfy the causation and retaliatory motive elements of his claim), *R. & R. adopted by* 2010 WL 2667680 (N.D. Tex. July 1, 2010).

### 2. Harassment

Welsh attempts to proceed under an alternate theory of liability based on the same facts by raising a harassment claim under the Fourteenth Amendment. Compl. 37; *see* Questionnaire 67. There is no freestanding constitutional right to be free from harassment. *See, e.g.*, *Jones v. City of Prentiss*, No. 2:15cv78–KS–MTP, 2016 WL 783015, at *4 & n.14 (S.D. Miss. Feb. 12, 2016) (noting absence of "authority for the proposition that general allegations of harassment constitute a freestanding cause of action under federal law"), *R. & R. adopted by* 2016 WL 815008 (S.D. Miss. Feb. 29, 2016); *Patton v. Hinds Cnty. Juv. Det. Ctr. (Henley-Young)*, No. 3:10–CV–00138–CWR–LRA, 2011 WL 2912897, at *7 n.11 (S.D. Miss. July 18, 2011) ("The United States Constitution does not preclude harassment."); *Darbonne v. Gaudet*, No. 03-1989, 2005 WL 1523328, at *7 (W.D. La. June 22, 2005) (observing lack of authority "holding that stalking[] and[/or] harassment is a violation of a federally protected constitutional or statutory right" and rejecting Fourteenth Amendment claim). As such, the district judge should dismiss this claim.

### I. The Court should dismiss Welsh's municipal liability claims.

Welsh alleges that the City failed to adequately train its police officers and the County failed to sufficiently train its prosecutors. Compl. 34. Welsh identifies LPD Chief Hester as the policymaker for the City, and Sheriff Maddox, DA Say, and ADA Redman as the policymakers for the County. *Id.* at 4–5. Welsh further sues Say, Redman, and Maddox (all Lamb County officials) in their official capacities. *Id.* at 4. An official capacity suit generally amounts to a suit

against the entity of which the officer is an agent—e.g., a claim against a deputy in his official capacity equals a claim against the sheriff's office—and therefore constitutes a municipal liability claim. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 n.55 (1978). Accordingly, the Court considers Welsh's official capacity claims along with his claims against the municipalities.

To establish municipal liability under § 1983 a plaintiff must demonstrate the following elements: (1) a policymaker; (2) an official policy; and (3) a policy or custom "whose 'moving force'" causes a violation of constitutional rights. *Piotrowski*, 237 F.3d at 578 (quoting *Monell*, 436 U.S. at 694). "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." *Id.*; *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." (emphasis omitted)). Thus, to state a successful municipal liability claim, a plaintiff must allege facts showing that the municipality violated the plaintiff's constitutional rights through an official policy or "governmental custom, even if such custom has not received formal approval." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* When such a claim is made, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Snyder v. Trepagnier*, 142

F.3d 791, 798 (5th Cir. 1998) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "In this inquiry, mere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

The plaintiff must show that "(1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy, and (3) the inadequate hiring or training policy directly caused the plaintiff's injury." *Conner v. Travis Cnty.*, 209 F.3d 794, 796 (5th Cir. 2000) (per curiam) (citation omitted); *see Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). "Deliberate indifference is more than mere negligence." *Conner*, 209 F.3d at 796. It "is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) (citation omitted). Generally, "a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Peña*, 879 F.3d at 623 (brackets, internal quotation marks, and citation omitted).

Welsh pleads the same failure-to-train claims against each municipality. First, he contends the City and the County did not adequately train police officers and prosecutors as to "the rights of the sexually violent predator class in the area of Texas Health and Safety Code 841.0838"— i.e., Welsh's belief that TCCC personnel cannot use mechanical or chemical restraints against him under Texas state law. *See* Compl. 34; Questionnaire 53–57. In Welsh's view, "[t]he current training does not recognize that force used by TCCC staff outside of the contractual or statutory grant of power is an assault." Questionnaire 56. Welsh also avers that the municipalities failed to properly train officers and prosecutors "not to over charge Welsh to cover up the assaults

performed by [TCCC] security." Compl. 34. He posits that "[t]raining should include to prosecute only crimes that an individual does commit and not to over reach making up crimes to charge with a felony just because [TCCC administration] . . . do[es] not like an individual." Questionnaire 57, 59. The Court refers to these alleged training inadequacies as the "non-prosecution" and "overcharging" theories.

### 1. City of Littlefield

Welsh's non-prosecution claim relies on the assertion that LPD needs "additional training . . . in the area of Texas Health and Safety Code 841.0838." Compl. 34. He further avers that "LPD training should include the scope of the contract" and "Texas Admin Code 810." Questionnaire 57; *see id.* at 55 (discussing TEX. ADMIN. CODE § 810.155). Although his claim rests on the September 2020 alleged assault, Welsh also discusses the November 2017 incident because he believes it further supports his allegation.[21] *Id.* at 54–57. Taken together, Welsh alleges that "[t]he current training does not recognize that force used by TCCC staff outside of the contractual or statutory grant of power is an assault." *Id.* at 56. This claim is a restatement of those against municipal defendants in their individual capacities based on their failure to criminally charge TCCC personnel for assault. *See* Compl. 32–34.

Welsh also avers that the City failed to properly train police officers "not to over charge Welsh to cover up the assaults performed by [TCCC] security," which mirrors his Fourteenth Amendment fabrication-of-evidence claim. *Id.* at 31–32, 34. In support, Welsh again relies on the November 2017 and September 2020 incidents. As to the former, Welsh alleges Chief Hester

---

[21] Welsh's questionnaire response discusses four incidents in total; however, the Court does not consider the January 2016 and March 2017 allegations in connection with Welsh's failure-to-train claim because they occurred prior to the enactment of § 841.038. *See* Questionnaire 55 (acknowledging that the statute became law on Nov. 1, 2017). Further, § 810.155 became law in 2018, and the contract on which Welsh relies was signed "under the authority of Chapter 841 of the Texas Health and Safety Code," and has a defined term beginning September 1, 2019. Compl. 45–46.

"criminally charge[d] [Welsh] with a felony tampering with evidence to cover up the assaultive force by TCCC staff" "knowing that could not be a thing under the law."  Questionnaire 55, 57. Considering the September 2020 claim, Welsh contends Officer Williams charged him with felony assault "knowing that he did not have the evidence of a security officer or evidence that Chavez acted within the scope of the contract."  *Id.* at 57.

Because Welsh has not established a viable constitutional violation as to either theory, he cannot maintain a failure-to-train claim.  *See Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) ("The district court was correct" in "dismiss[ing] the municipal liability claim because [plaintiff] failed to plausibly allege a constitutional violation."); *Brown v. Wilkinson Cnty. Sheriff Dep't*, 742 F. App'x 883, 884 (5th Cir. 2018) (per curiam) ("Having failed to demonstrate an underlying constitutional violation, [plaintiff's] failure-to-train-or-supervise claim against [the county], and his claims against the officers in their official capacities, fail."); *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) ("As is well established, every [municipal liability] claim requires an underlying constitutional violation." (internal quotation marks and citation omitted)). Accordingly, these claims should be dismissed.

### 2.  *Lamb County*

Welsh primarily relies on the September 2020 incident to support his claims against the County.  Concerning the non-prosecution theory, Welsh states that he "was assaulted clearly on September 15, 202[0]," but "Defendants have refused to press the criminal charges." Questionnaire 58.  And as to the overcharging theory, Welsh claims Defendants Redman and Say "present[ed] to the grand jury the higher degree of felony to cover up the assault of MTC staff," despite the fact that they knew "or should have known through their investigation that MTC staff . . . use[d] assaultive force, outside the statute 841.0838 and outside the contract which allows force to be used only in self-defense."  *Id.*  Welsh further avers that he has "been charged with a

crime three times after [he] [has] been assaulted by TCCC staff, twice with a felon[y]," although he does not specifically discuss the other two instances. *Id.* Based on Welsh's other allegations, the Court assumes Welsh refers to the November 2017 and January 2016 incidents.

"[A] county may only be held liable for acts of a district attorney when he 'functions as a final policymaker for the county.'" *Brown v. Lyford*, 243 F.3d 185, 192 (5th Cir. 2001) (citation omitted). "Texas law makes clear . . . that when acting in the prosecutorial capacity to enforce state penal law, a district attorney is an agent of the state, not of the county in which the criminal case happens to be prosecuted." *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997). In other words, because "a Texas district attorney is a state official when instituting criminal proceedings to enforce state law," actions taken "within the scope of his prosecutorial function during a criminal proceeding do not constitute official policy for which a county can be held liable." *Id.* (discussing *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) and *Krueger v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995) (per curiam)). Welsh's allegations against the County are based on its prosecutors' charging decisions—what charges to bring and against whom. Such power comes from the State of Texas, not Lamb County. *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 278 (5th Cir. 2001) ("The district attorney, when acting in the prosecutorial capacity or instituting criminal proceedings to enforce state law, is not" "the county's final policymaker in this context." (alteration and internal quotation marks omitted)). Thus, DA Say and ADA Redman are not county policymakers in this context because Welsh's claims against them "involve only actions as state officers." *Id.*; *see Arnone v. Cnty. of Dall. Cnty.*, 29 F.4th 262, 270 (5th Cir. 2022) ("A policy governing when to exercise [state] power . . . is inextricably linked to that use of state power . . . .").

Similarly, even considering Sheriff Maddox as the county policymaker, the County "cannot be liable for a failure to train" Say and Redman because they are state officers when acting in a

prosecutorial capacity to enforce state penal laws. *See Mowbray*, 274 F.3d at 278 (holding that county could not be liable for failing to train its prosecutors because they are state officers); *accord Arnone*, 29 F.4th at 272; *Brown v. City of Houston*, 297 F. Supp. 3d 748, 767–68 (S.D. Tex. 2017); *Moon v. City of El Paso*, No. SA–06–CA–925–OG, 2016 WL 9777021, at \*8 (W.D. Tex. Oct. 31, 2016), *aff'd*, 906 F.3d 352 (5th Cir. 2018); *Estrada v. Healey*, No. H–15–0092, 2015 WL 13158515, at \*6 (S.D. Tex. July 31, 2015), *aff'd*, 647 F. App'x 335 (5th Cir. 2016); *Wooden v. Texas*, No. 4:05-CV-022-A, 2005 WL 1473854, at \*2 (N.D. Tex. June 21, 2005). Accordingly, Welsh's municipal liability claims against the County should be dismissed.

### 3. Official Capacity Claims against DA Say and ADA Redman

As discussed above, Welsh's allegations against DA Say and ADA Redman implicate their roles as state officers. Any official capacities claims against them are therefore, in effect, against Texas. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *see also Perry v. State of Tex. Corp.*, No. 3:19-CV-2611-N (BH), 2022 WL 2657334, at \*5 (N.D. Tex. Apr. 4, 2022) (construing claims against DA in his official capacity as claims against the state), *R. & R. adopted by* 2022 WL 2652133 (N.D. Tex. July 8, 2022). It is well established that suits for monetary damages against state officials in their official capacities are barred both by state sovereign immunity and the Eleventh Amendment, and therefore cannot succeed under § 1983. *See Almond v. Tarver*, 468 F. Supp. 2d 886, 892–95 (E.D. Tex. 2006) (collecting authorities). Moreover, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, any claims against Say and Redman in their official capacities should be dismissed.

**J.  The Court should decline to exercise supplemental jurisdiction over Welsh's state law claims.**

Welsh attempts to bring several state law claims against Defendants Schmoker, Chavez, and MTC including malicious prosecution, breach of contract, negligence per se, invasion of privacy, intentional infliction of emotional distress, and negligent hiring, supervision, and training. Compl. 30, 36–38.

"Federal courts may, under limited circumstances, exercise jurisdiction over state law claims." *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993) (per curiam).   Under 28 U.S.C. § 1367(a), federal courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."   "That power," however, "need not be exercised in every case in which it is found to exist."   *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).   It "is a doctrine of discretion, not of plaintiff's right."   *Id.*   Section 1367 instructs that a court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law, the claim substantially predominates over the claims over which the district court has original jurisdiction, the court has dismissed all claims over which it has original jurisdiction, or there are other compelling reasons for declining jurisdiction.  § 1367(c)(1)–(4).   In addition to these "statutory factors," courts must look "to the common law factors of judicial economy, convenience, fairness, and comity" and "guard against improper forum manipulation." *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011).

The Fifth Circuit's "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."  *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).  Here, the undersigned has recommended dismissal of all federal claims against Defendants Schmoker, Chavez, and MTC.  The Court should therefore decline to exercise

supplemental jurisdiction over Welsh's state law claims against these parties. *See Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) ("[S]ince no federal claims remain against the individual defendants, we instruct the district court to dismiss the pendent state claims against those defendants as well, without prejudice to refiling those claims in state court."); *Clark v. Anderson*, No. 4:15–CV–360–A, 2015 WL 3960886, at *4 (N.D. Tex. June 29, 2015) (dismissing state law claims without prejudice after dismissal of federal claims because "it would be highly inappropriate to cause those defendants to remain a party to this action simply because plaintiff has alleged state law claims, over which this court normally would not have jurisdiction, against those defendants"); *Daniels v. Thaler*, No. C-09-299, 2009 WL 5216880, at *6 (S.D. Tex. Dec. 30, 2009) (declining supplemental jurisdiction over state law claims against defendants whose constitutional claims had been dismissed).

## IV.    <u>Recommendation</u>

Based on the foregoing, the undersigned recommends that the United States District Judge dismiss with prejudice Welsh's Complaint and all claims alleged therein, except that the district judge should dismiss without prejudice (1) those claims against DA Say and ADA Redman for their non-prosecution of the March 2022, May 2022, and May–October 2022 incidents; and (2) the state law claims against all parties.

## V.    <u>Right to Object</u>

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2016); FED. R. CIV. P. 72(b).  To be specific, an objection must identify the specific finding, conclusion, or recommendation to which the objection is made,

state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: June 30, 2023.

_____
**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**